HUGHES INTERNATIONAL SALES CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6226–90.          Filed March 31, 1993.

*McGee Grigsby, Diane Sacks,* and *Gregory P. Broome,* for petitioner.

*Charles O. Cobb* and *James G. Lebloch,* for respondent.

---

GERBER, *Judge:* Respondent determined Federal income tax deficiencies in petitioner's taxable income of $4,904,470 and $14,143,945 for the taxable years ending March 31, 1982, and March 31, 1983, respectively. The deficiencies are solely attributable to respondent's determination that petitioner did not qualify as a domestic international sales corporation (DISC).

The major issue for consideration is the validity of certain aspects of section 1.993-6(e)(1), Income Tax Regs. Two preliminary issues also for consideration are (1) whether domestic sales, erroneously included as qualified export receipts, should be included in the gross receipts test which is a prerequisite to petitioner's qualifying as a DISC; and (2) whether, in the context of this litigation, petitioner can increase the amount of qualified export receipts it reported on its Federal income tax return.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. Petitioner's principal place of business at the time of the filing of the petition in this case was Los Angeles, California.

Hughes Aircraft Co. (Hughes) manufactured sophisticated electronic products for use in the defense industry. Petitioner, Hughes International Sales Corp. (HISC), was incorporated by Hughes on October 19, 1973, in the State of California. Hughes owned 100 percent of HISC's one class of voting common stock outstanding during the years in issue. Hughes formed HISC to be its export sales representative and exporter.

HISC elected to file its Federal income tax returns on a fiscal year basis ending on March 31. On December 20, 1973, HISC filed an election to be taxed as a DISC under section 992.[1] HISC also elected to use the accrual method of accounting for financial reporting and tax purposes. HISC had no employees and was not engaged in manufacturing or construction.

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue unless otherwise indicated.

HISC and Hughes entered into a written sales representative agreement on October 19, 1973. Under the terms of the agreement, HISC agreed to act as Hughes' agent, and Hughes agreed to pay HISC a commission, for all sales of Hughes' products and services exported from the United States. The agreement provided for commissions on foreign or export sales, and it did not contain reference to domestic sales or specifically preclude HISC from receiving commissions on domestic sales. HISC entered into identical agreements with other Hughes subsidiaries.

Hughes filed its consolidated Federal income tax returns on a 52-53-week year ending on the Sunday closest to December 31. During the years in issue, Hughes employed two methods of accounting for income tax purposes. For some transactions it used the accrual method of accounting and, for eligible long-term contracts, it used a variation of the accrual method of accounting—the completed contract method of accounting. Hughes received permission to use the completed contract method of accounting as described in section 1.451-3, Income Tax Regs., on January 15, 1975, by means of a private letter ruling. For Federal income tax purposes, Hughes deducted the commissions payable to HISC for all contracts in the year accrued.

HISC's only sources of income were commissions from the sales representative agreements and interest income from foreign accounts receivable, which HISC received as commissions from Hughes and its subsidiaries. See *infra* p. 296. HISC reported its commission income using the accrual method of accounting. HISC accrued commissions earned in the same year that Hughes, or one of its subsidiaries, shipped the export product to the foreign purchaser.

For the taxable year ending on March 31, 1982, HISC reported commission income of $7,918,257 and interest income of $2,743,634 for a total of $10,661,891. Hughes and its subsidiaries claimed corresponding commission expense deductions. Hughes transferred $9,586,815 of foreign receivables to HISC in December 1981 to pay commissions of $7,384,200 and interest of $2,202,615. Hughes paid the remaining $1,075,076 owed ($10,661,891–$9,586,815) in May 1982 by transferring additional foreign receivables to HISC.

On HISC's Federal income tax return for the year ended March 31, 1982, HISC reported qualified export receipts of

$168,763,350. Omitted from that amount was $11,854,320 of qualified export receipts that could have been included but were not due to a bookkeeping error. Additionally, HISC included $1,751,283 of domestic sales in qualified export receipts. HISC argues that the commissions on the domestic sales were inadvertently included. The domestic sales were received under a contract which originally had been limited to foreign sales. After that contract was in effect and prior to the taxable years under consideration, Hughes and the customers modified the contract to include some domestic sales. After the contract modification and during the taxable year ended March 31, 1982, commissions from domestic sales, along with foreign sales, were paid to and reported by HISC.

A portion of HISC's qualified export receipts was attributable to long-term contracts that Hughes reported using the completed contract method of accounting. If HISC had used the completed contract method of accounting to compute its qualified export receipts, its qualified export receipt amount for the taxable year ended March 31, 1982, would have been reduced by $67,298,357.

For the taxable year ending on March 31, 1983, HISC reported commission income of $28,338,991 and interest income of $2,408,715 for a total of $30,747,706. Hughes and its subsidiaries claimed corresponding commission expense deductions. Hughes transferred $9,086,512 of foreign receivables to HISC in December 1982 to pay commissions of $7,145,280 and interest of $1,941,232. Hughes paid the remaining $21,661,194 owed ($30,747,706–$9,086,512) to HISC in May 1983 by transferring additional foreign receivables.

On HISC's Federal income tax return for the year ended March 31, 1983, HISC reported qualified export receipts of $348,315,640. Of the qualified export receipts, $13,784,333 was attributable to domestic sales and petitioner argues that it should not have been included. A portion of HISC's qualified export receipts was attributable to long-term contracts that Hughes reported using the completed contract method of accounting. If HISC had used the completed contract method of accounting to compute the corresponding portion of its qualified export receipts, the qualified amount for the taxable

year ended March 31, 1983, would have been reduced by $241,451,118.

Hughes accrued the commissions payable to HISC in the same year that it shipped the export product to the foreign purchaser. Hughes deducted the commissions in the year accrued, which was the same year HISC included the commissions in income. In the years in which the commissions were accrued, HISC included amounts in its qualified export receipts and gross receipts based on invoices that Hughes sent to foreign purchasers upon shipment of export property.

Hughes deferred the income from accounts reported under the completed contract method of accounting if the contract was not completed during the taxable year. HISC, under the accrual method of accounting, included in its qualified export receipts and gross receipts amounts attributable to underlying long-term contracts deferred by Hughes in which Hughes paid HISC a commission. HISC was not on the completed contract method in connection with these transactions, and reported the receipts or income earlier than it would have if subject to the completed contract method. Correspondingly, Hughes claimed the commission deductions due to HISC in the year accrued, which was before Hughes was required to report income from the long-term contracts under the completed contract method of accounting.

## OPINION

### The DISC Statutory Background and Framework

In 1971, in order to encourage and increase exports, Congress enacted[2] the DISC provisions[3] as part of the Internal Revenue Code. A corporation qualifying as a DISC is generally not subject to tax. Sec. 991. Instead, approximately one-half of the DISC's income is deemed to have been distributed to its shareholders, and is taxed to them currently. Sec. 995; *L&F Intl. Sales Corp. v. United States,* 912 F.2d 377, 378 (9th Cir. 1990). The other half of the DISC's income is tax deferred.

To qualify as a DISC a corporation must make an election and meet certain requirements. Sec. 992. These requirements include an annual gross receipts test, an annual asset test, and a stock requirement. Sec. 992(a)(1)(A), (B), and (C). The

---

[2] Revenue Act of 1971, Pub. L. 92-178, sec. 501, 85 Stat. 497, 535.
[3] Secs. 991-997.

requirements are designed to permit the tax benefits only where the DISC's assets and receipts almost exclusively (95 percent) concern export activity.[4]

The annual asset test requires that the adjusted basis of the corporation's qualified export assets equal or exceed 95 percent of the adjusted basis of all the corporation's assets. Sec. 992(a)(1)(B). The stock test requires that the corporation have only one class of stock. Sec. 992(a)(1)(C). The annual gross receipts test requires a corporation to have "95 percent or more of the gross receipts (as defined in section 993(f)) of such corporation consist of qualified export receipts (as defined in section 993(a))". Sec. 992(a)(1)(A). Respondent questions only whether HISC satisfies the gross receipts test. No other requirements of the statute and regulations are in question.

The gross receipts test can be expressed as a fraction with qualified export receipts being the numerator and gross receipts being the denominator. To pass the test, the fraction must result in a ratio that is equivalent to 95 percent or greater. Section 993(a) defines qualified export receipts to include gross receipts from the sale, exchange, or other disposition of export property. Sec. 993(a)(1)(A). Gross receipts are defined in section 993(f) to include total receipts from the sale of property and gross income from all other sources. Section 993(f) also contains the statement that "In the case of commissions on the sale, lease, or rental of property, the amount taken into account for purposes of this part as gross receipts shall be the gross receipts on the sale, lease, or rental of the property on which such commissions arose." Accordingly, in computing whether the 95-percent gross receipts test is met, the statute requires a commission DISC to look through its commissions to the gross receipts that generated those commissions. The statute, however, is silent about whether the DISC's or its related supplier's accounting method should be utilized in computing the 95-percent test.

---

[4] Although the 95-percent asset and receipt requirements are rather stringent, Congress was not attempting to fashion an all or nothing technical type test. By enacting deficiency distribution provisions for corporations, which for reasonable cause failed to meet certain of the requirements, Congress evidenced its intent not to make this a trap for the unwary. See sec. 992(c).

*The Regulatory Requirement*

A. *The Accounting Conformity Question*

Section 1.993-6, Income Tax Regs., contains an additional requirement to meet the gross receipts test. Under the regulation, in the case of commission transactions, a commission agent for a related supplier (as defined in section 1.994-1(a)(3)(ii), Income Tax Regs.) must compute its gross receipts as if it used the same method of accounting as its related supplier.[5] Sec. 1.993-6(e)(1), Income Tax Regs. HISC argues that to the extent the regulation requires a DISC to compute the gross receipts test under the same accounting method as its related supplier, it is invalid.

HISC was created in 1973 by Hughes in response to the 1971 DISC legislation. HISC is a commission agent for Hughes. Hughes is a related supplier.[6] Therefore, under the regulation, HISC would be required to compute its gross receipts, and its qualified export receipts, as if it used Hughes' method of accounting. Hughes generally uses the accrual method of accounting but, for qualified long-term contracts, uses the completed contract method of accounting. HISC uses the accrual method of accounting for all contracts. Respondent does not dispute that HISC was engaged solely in the activities that the DISC legislation was intended to encourage, or that virtually all of HISC's receipts were from bona fide export receipts. However, HISC would fail the gross receipts test and not be qualified as a DISC, in both years, under respondent's argument that Hughes' method of accounting be used to determine the numerator and HISC's method of accounting be used to determine the denominator. As a preliminary matter, we think respondent has misinterpreted the regulations.

Section 1.993-6, Income Tax Regs., contains the definition of gross receipts, which constitutes the denominator of the gross receipts fraction. Section 1.993-6(e)(1), Income Tax Regs., concerns commission transactions and defines gross receipts for a commission DISC as the gross receipts arising

---

[5] Sec. 1.993-6(e)(1), Income Tax Regs., in pertinent part, provides that "In the case of a commission agent for a related supplier * * * the gross receipts or gross income of such agent shall be determined as if it used the same method of accounting as its related supplier."

[6] Sec. 1.994-1(a)(3)(ii), Income Tax Regs., defines a related supplier as "a related party which singly engages in a transaction directly with the DISC".

from the underlying sales transaction that generated the commission. In that section there is an explicit requirement that gross receipts be determined under the same method of accounting as the DISC's related supplier uses. Section 1.993-1(b), Income Tax Regs., concerns qualified export receipts (which amount is the numerator of the gross receipts test fraction), and identifies such receipts as gross receipts from the sale of export property by the DISC or any principal for which it acts as commission agent.

Respondent interprets the regulations as requiring HISC to eliminate unreported long-term contract gross receipts, under Hughes' method of accounting, only from the numerator of the fraction (qualified export receipts), and not the denominator (gross receipts). We do not agree. Section 1.993-6(e)(1), Income Tax Regs., contains the explicit requirement that a commission DISC must use its related supplier's method of accounting in computing gross receipts, which is the denominator of the fraction. Therefore, respondent's position that Hughes' method of accounting would not apply when computing gross receipts for purposes of the 95-percent gross receipts test cannot be accepted. Furthermore, qualified export receipts is a subset of gross receipts, and if HISC must use Hughes' method of accounting to compute gross receipts, then it must also use Hughes' method of accounting to compute qualified export receipts.

## B. *The Domestic Sales Question*

On that assumption, i.e., if Hughes' accounting method is used to compute qualified export receipts and gross receipts, HISC would fail the test in at least 1 year. For the taxable year ended March 31, 1983, HISC claims that Hughes inadvertently paid it commissions on domestic sales. Although "inadvertently" paid and/or included, Hughes in fact paid those commissions to HISC.

Section 1.993-6(e)(1), Income Tax Regs., contains the requirement that for commission transactions, the DISC's gross receipts are the gross receipts in the underlying transaction. Because Hughes paid HISC a commission on the domestic sales, it is a transaction that gave rise to a commission. Based on this regulation, the gross receipts attributable to the domestic sales are included in HISC's gross receipts.

These amounts are not included in HISC's qualified export receipts because they are admittedly attributable to domestic sales. Sec. 993(a).

Petitioner, on opening brief, argued that because the domestic commissions were included inadvertently, they should be ignored for purposes of the gross receipts test. HISC asserted that, under the sales representative agreements, it was not entitled to a commission for these sales; therefore, the transaction should not be included for the gross receipts test. HISC alternatively argued that, under section 1.993-6(e)(2), Income Tax Regs.,[7] the amounts should not be included in qualified export receipts or gross receipts.[8]

We do not agree with petitioner because section 1.993-6(e)(2), Income Tax Regs., does not apply where a commission was paid, even if the DISC was not entitled to one. Petitioner's interpretation of this regulation is literally possible, but it does not harmonize with the purpose of the 95-percent gross receipts test where the commission has been paid. Section 1.993-6(e)(2), Income Tax Regs., is a regulation which simply recites an axiomatic guide for segregating foreign from domestic gross receipts where the parent corporation has both types of transactions with customers and has paid commissions with respect to foreign transactions.

Petitioner had received and included the commission and respective gross receipts in its return and computations. Petitioner has not shown that it had anything less than unfettered use and enjoyment of the commissions on the domestic transaction through the time of trial (for about 10 years).[9] If petitioner's interpretation was correct, it is unlikely that any commission DISC would fail the gross receipts test so long as it was under an exclusively foreign sales contract, whether it

---

[7] Sec. 1.993-6(e)(2), Income Tax Regs., provides:

If the commission arrangement provides that the commission agent will receive a commission only with respect to sales or leases of export property, or the furnishing of services, which result in qualified export receipts, the commission agent will not take into account the gross receipts or gross income, as the case may be, derived by the principal from any transaction for which the commission agent would not be entitled to a commission under the commission arrangement.

[8] However, in its reply brief, petitioner conceded that the gross receipts attributable to the domestic commissions should only be included in the denominator of the fraction if sec. 1.993-6(e)(2), Income Tax Regs., does not apply. Additionally, the parties did not question or address the validity of this regulation section.

[9] See *United States v. Lewis,* 340 U.S. 590, 591 (1951).

complied with the contract or not.[10] Therefore, section 1.993-6(e)(2), Income Tax Regs., does not apply and the gross receipts attributable to the domestic sales are included in HISC's gross receipts but not in HISC's qualified export receipts.

For the year ended March 31, 1982, HISC would pass the 95-percent gross receipts test irrespective of whether the completed contract or accrual method of accounting is used in the computations.[11] However, for the year ended March 31, 1983, HISC would fail the 95-percent gross receipts test if it utilized Hughes' completed contract method of accounting.[12] For the same taxable year, HISC would pass the 95-percent gross receipts test if it used the accrual method of accounting.[13] Therefore, we must decide the validity of the accounting conformity requirement of section 1.993-6(e)(1), Income Tax Regs., in order to decide whether HISC qualifies as a DISC for both of the years under consideration.

---

[10] The legislative history contains the statement that the gross receipts for a commission DISC should be comparable to the gross receipts of a buy-sell DISC. H. Rept. 92-533 (1971), 1972-1 C.B. 498, 537. For a buy-sell DISC, the gross receipts are "The total amounts received or accrued * * * from the sale * * * of property held primarily for sale * * * in the ordinary course of a trade or business". Sec. 1.993-6(a)(1), Income Tax Regs. Qualified export receipts for a buy-sell DISC include "gross receipts from the sale of export property by such DISC". Sec. 1.993-1(b), Income Tax Regs. Specifically excluded from qualified export receipts are gross receipts from the sale of property for ultimate use in the United States. Sec. 1.993-1(j)(2), Income Tax Regs. Therefore, a buy-sell DISC's gross receipts would include domestic sales in the denominator of the 95-percent gross receipts test, but not the numerator, because they do not constitute qualified export receipts.

Because a commission DISC and a buy-sell DISC are to be treated equally, interpreting sec. 1.993-6(e)(2), Income Tax Regs., such that the domestic sales do not affect the 95-percent gross receipts test would give commission DISC's an unfair advantage over buy-sell DISC's.

[11] In addition to the claim of erroneously included domestic receipts, HISC claims to have failed to include some qualified export receipts for the taxable year ended Mar. 31, 1982. Those receipts were inadvertently omitted, and HISC now seeks to include them. HISC has not shown that Hughes paid a commission on the amount it failed to include, either during the taxable year or within 60 days after the close of that year.

The sole focus of this case concerns whether HISC qualifies as a DISC and, more specifically, whether HISC met the 95-percent gross receipts test. HISC would meet the 95-percent gross receipts test and qualify as a DISC for the year ended Mar. 31, 1982, irrespective of how we would decide this issue. Accordingly, it is unnecessary for us to decide whether HISC may include the omitted qualified export receipts.

[12] The calculation would be as follows:

$$\frac{348,315,640 - 13,784,333 - 241,451,118}{348,315,640 + 2,408,715 - 241,451,118} = \frac{93,080,189}{109,273,237} = 85\%$$

[13] The calculation would be as follows:

$$\frac{348,315,640 - 13,784,333}{348,315,640 + 2,408,715} = \frac{334,531,307}{350,724,355} = 95\%$$

*Is Section 1.993-6(e)(1), Income Tax Regs., Legislative or Interpretative?*

HISC asks us to invalidate the portion of section 1.993-6(e)(1), Income Tax Regs., which requires use of its related supplier's method of accounting in computing the gross receipts test. As a threshold matter, we consider whether the regulation in question is legislative or interpretative. The answer to that question will have some bearing on the standard of review for the regulation. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982); *Dresser Industries v. Commissioner,* 92 T.C. 1276, 1289 (1989), affd. in part and revd. in part 911 F.2d 1128 (5th Cir. 1990). Interpretative regulations are not accorded as much deference as a legislative regulation "'issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision.'" *United States v. Vogel Fertilizer Co., supra* (quoting *Rowan Cos. v. United States,* 452 U.S. 247, 253 (1981)).

Respondent argues that section 1.993-6, Income Tax Regs., is a legislative regulation issued under section 994(b)(1). HISC argues that the regulation was issued under the general grant of authority contained in section 7805(a) and, therefore, is an interpretative regulation.

Section 994(a) concerns the sale of export property to the DISC and limits the taxable income attributable to such sale to an intercompany transfer price which does not exceed the greatest of three stated methods.[14] Section 994(b)(1) gives the Commissioner authority to promulgate regulations for the application of intercompany pricing rules to commission DISC's. Respondent argues that section 994 deals with the definition and computation of gross receipts, which is the starting point for transfer pricing methods under the 4-percent gross receipts and the combined taxable income methods set forth in section 994(a)(1) and (2). From that premise, it appears that respondent thought it appropriate to address accounting methods and matching concepts in the regulations under section 993, which involves the definitions of qualified export receipts, gross receipts, and other related matters concerning qualification as a DISC.

---

[14] The three methods are described in sec. 994(a)(1), (2), and (3).

Section 994(b)(1), however, does not enable the Secretary to promulgate legislative regulations regarding all DISC provisions and concepts. The Secretary's authority under section 994(b)(1) does not extend to the definition of gross receipts. Accordingly, section 1.993-6, Income Tax Regs., is an interpretative regulation. See *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 800-801 (11th Cir. 1985), affg. 79 T.C. 1054 (1982).

With respect to interpretative regulations, section 7805(a) provides the Secretary with general authority to prescribe all needful rules and regulations. A regulation "'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes,' and 'should not be overruled except for weighty reasons.'" *Bingler v. Johnson,* 394 U.S. 741, 750 (1969) (quoting *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948)). Although a regulation is entitled to considerable weight, the Commissioner "may not usurp the authority of Congress by adding restrictions to a statute which are not there." *Estate of Boeshore v. Commissioner,* 78 T.C. 523, 527 (1982). Additionally, a regulation is not a reasonable statutory interpretation unless it harmonizes with the plain language of the statute, its origins, and its purpose. *United States v. Vogel Fertilizer Co., supra* at 25; *National Muffler Dealers Association v. United States,* 440 U.S. 472, 477 (1979); *Durbin Paper Stock Co. v. Commissioner,* 80 T.C. 252, 257 (1983).

*Does the Regulation Harmonize and Comport With the Intent and Language of the Statute?*

Respondent's concern involves the possibility that Hughes is obtaining a timing benefit in addition to the tax benefit Congress provided to encourage exports. Respondent argues that without section 1.993-6(e)(1), Income Tax Regs., Hughes would obtain (indirectly through its ownership of HISC) the reduced taxation and deferral intended by means of the DISC provisions, and would also receive deductions for the commissions paid to the DISC even though Hughes was not required to report the income under the completed contract accounting method until a subsequent taxable year.

However, a DISC is a separate corporation, sec. 992(a)(1), and as such, a DISC may, generally, choose its own method

of accounting. Sec. 446; sec. 1.991-1(b)(2), Income Tax Regs. Under these provisions, HISC chose to use the accrual method of accounting.[15] The DISC statutory provisions under consideration (sections 993 and 994) are silent on the question or requirement of matching accounting methods. Respondent's concern, as set forth in the regulation, is with alleged mismatching of income and deductions by Hughes, the parent corporation. Hughes is not a petitioner or party to this case, and its income and deductions are not before us for our consideration. Rather, we are only confronted with the question of whether HISC meets the 95-percent gross receipts test[16] of sections 992 and 993.

The legislative history directly undercuts section 1.993-6(e)(1), Income Tax Regs., as applied by respondent in this case.[17] Respondent, while acknowledging the significance of the legislative history on this issue, argues that it would not enable HISC to pick any accounting method it wishes. Respondent's argument misses the point. The legislative history addresses the question under consideration, as follows:

The time when the [gross] receipts on a commission sale (lease or rental) arise is to be determined under the commission arrangement and the accounting method otherwise employed by the DISC. For example, in the case of a deferred payment sale, if under the DISC's accounting method it would be considered as having received the entire commission in the year of sale, then the entire amount of gross receipts to which the commission relates is to be considered as received in that year, even though actual payment is not made until subsequent years. On the other hand, if under

[15] Respondent does not contend that HISC is precluded from using the accrual method of accounting under sec. 446 or sec. 1.991-1(b)(2), Income Tax Regs. Respondent likewise is not contending that the accrual method of accounting does not clearly reflect the income of HISC.

[16] The matching of income and deductions is normally addressed in sec. 446 and related sections. Secs. 992 and 993 do not address the matching of income and deductions or coordination of accounting methods. Instead, the gross receipts test is designed simply to permit certain tax benefits where a DISC's receipts almost exclusively (95 percent) concern export activity. That requirement was met by HISC for the years under consideration. HISC fits exactly within congressional intent—it was created to take advantage of the special tax treatment afforded export activity. There has been no evasion of that purpose by HISC or Hughes. Although we do not address the accounting question here, we note that question should be addressed by means of the normal accounting method sections and in connection with Hughes' tax liability.

[17] It is appropriate to defer to the legislative history in the setting of this case. Here the text of the statute is silent on the disputed point addressed by the regulation, but the legislative history, as contained in the House and Senate reports, accompanying the enactment of the statute, considers the point explicitly. The Secretary did not have legislative regulatory authority, and the regulation produces a result that departs from the legislative history. We are not persuaded that this departure is warranted by respondent's arguments, which focus on the alleged mismatching of income and deductions by Hughes. Respondent's concern in that respect does not come within the intended scope of the 95-percent gross receipts test. In this setting, the legislative history plays a more significant role.

the DISC's method of accounting, it would be considered as having received the commission only as the payments for the property sold were received in future years, then the gross receipts on the sale are to be considered as received in each subsequent year to the extent they relate to the commission which the DISC is considered as receiving in that year. [H. Rept. 92-533 (1971), 1972-1 C.B. 498, 537; S. Rept. 92-437 (1971) 1972-1 C.B. 559, 618.]

The accounting method otherwise employed by HISC is the accrual method of accounting.[18] Accordingly, to the extent that section 1.993-6(e)(1), Income Tax Regs., would require HISC to use Hughes' completed contract method of accounting when computing gross receipts for purposes of the 95-percent gross receipts test, we find it to be invalid. If Hughes is receiving an additional timing benefit, the gross receipts test is not the appropriate vehicle to address that issue. "Respondent has no power to promulgate a regulation adding provisions that he believes Congress should have included but did not." *Durbin Paper Stock Co. v. Commissioner, supra* at 261 (citing *Helvering v. Credit Alliance Corp.,* 316 U.S. 107, 113 (1942)).

To reflect the foregoing,

*Decision will be entered for petitioner.*

Reviewed by the Court.

HAMBLEN, PARKER, SHIELDS, COHEN, CLAPP, JACOBS, WRIGHT, PARR, COLVIN, and LARO, *JJ.,* agree with the majority opinion.

---

CHABOT, *J.,* concurring: I agree with, and join in, the majority's analysis and partial invalidation of section 1.993-6(e)(1), Income Tax Regs. I do not join in the majority's analysis of section 1.993-6(e)(2), Income Tax Regs., because (a) the majority's analysis of subparagraph (2) does not affect the decision in the instant case or the partial invalidity of subparagraph (1); (b) the parties focused primarily on subparagraph (1); and (c) it would be better for the administration of the tax laws if we did not decide the meaning of

---

[18] HISC points out that it is not qualified to use the completed contract method of accounting. Instead, a commission is includable in HISC's income for the year in which Hughes shipped the product to the foreign buyer. Therefore, the proceeds from the sale are includable in HISC's income for that year for purposes of the gross receipts test.

subparagraph (2) until either the parties before us make a more thorough presentation on the matter or we need to decide the matter in order to decide the case.

HAMBLEN, COHEN, BEGHE, and CHIECHI, *JJ.*, agree with this concurring opinion.

---

RUWE, *J.*, concurring: I agree with the result reached by the majority; however, I would reach that result by applying the literal terms of section 1.993-6(e)(2), Income Tax Regs.

It is clear that HISC erroneously received commissions on some of Hughes' domestic sales even though, under the commission agreement between HISC and Hughes, HISC was only entitled to commissions on export sales. This situation and its effect on the 95-percent gross receipts requirement of section 992(a)(1)(A) is explicitly addressed by section 1.993-6(e)(2), Income Tax Regs., which provides:

> If the commission arrangement provides that the commission agent will receive a commission only with respect to sales or leases of export property, or the furnishing of services, which result in qualified export receipts, the commission agent will not take into account the gross receipts or gross income, as the case may be, derived by the principal from any transaction for which the commission agent would not be entitled to a commission under the commission arrangement.

The majority holds that the regulation "does not apply where a commission was paid". Majority op. p. 301. The regulation itself contains no such exception. The only reason given for the majority's interpretation is its fear that a literal application of section 1.993-6(e)(2), Income Tax Regs., would make it "unlikely that any commission DISC would fail the gross receipts test so long as it was under an exclusively foreign sales contract, whether it complied with the contract or not." Majority op. pp. 301-302. While this may be true where the DISC's income is exclusively from commissions received from its principal, the commission arrangement provides for commissions only with respect to sales of export property, and the principal erroneously pays commissions in excess of those provided in the commission agreement, I see no particular reason why Congress would have intended a DISC to fail under these circumstances. Congress did not intend to create traps for the unwary. Majority op. note 4. The

organizational requirements for a DISC allow it to qualify even though it is no more than a bookkeeping device to measure the amount of export earnings that are subject to tax deferral. *Rocky Mountain Associates v. Commissioner,* 90 T.C. 1231, 1235 (1988). A regulation that salvages DISC status, despite an inadvertent and unwarranted payment of a commission on unqualified receipts, seems perfectly consistent with the statutory scheme so long as the regulation is part of an overall system that can prevent unintended tax benefits.

A literal reading of the regulation need not result in any unintended tax benefits. For example, in order to determine if a DISC meets the 95-percent gross receipts test, it would be necessary to determine whether the commissions paid to the DISC were for export sales pursuant to the commission agreement. It seems evident that any examination of these transactions that uncovered unqualified domestic sales commissions which were not payable pursuant to the commission agreement should result in the disallowance of deductions taken by the principal.[1] Erroneously paid domestic sales commissions would not qualify as an ordinary and necessary business expense.[2] The disallowance of deductions taken by the principal for domestic sales commissions would prevent the principal from shielding income that did not qualify for DISC benefits. Literal application of section 1.993-6(e)(2), Income Tax Regs., would then salvage the DISC's qualification for purposes of export sales, allowing the DISC to serve the congressional purpose of assisting domestic companies engaged in exporting goods by temporarily shielding them from tax on a portion of their export activities. See *Gehl Co. v. Commissioner,* 795 F.2d 1324, 1330 (7th Cir. 1986), affg. T.C. Memo. 1984-667.[3]

The majority states that a literal application of section 1.993-6(e)(2), Income Tax Regs., would result in unequal treatment between buy-sell DISC's and commission DISC's and

---

[1] We do not have Hughes' tax liability before us, and we apparently do not know whether respondent has disallowed deductions for the commissions on domestic sales. In any event, whether respondent has made proper adjustments to Hughes' tax liability should have no bearing on our application of the regulation.

[2] HISC had no employees, and the only predicate for its receipt and retention of sales commissions was the agreement that provided for commissions on export sales.

[3] The regulation was proposed in 1972 and adopted in 1977 when the congressional purpose was fresh in the minds of those who wrote the regulation.

give commission DISC's an unfair advantage. See majority op. note 10. I disagree. A buy-sell DISC purchases and sells property. Thus, the 95-percent gross receipts test for a buy-sell DISC depends on *actual* gross sales receipts of the DISC and no attribution of gross sales receipts is required. This, no doubt, is why there is no regulation comparable to section 1.993-6(e)(2), Income Tax Regs., dealing with buy-sell DISC's. A commission DISC, on the other hand, is entitled to commissions from its principal only pursuant to the terms of its contractual arrangement with the principal. For purposes of the 95-percent gross receipts test, gross sales receipts of the seller-principal are attributed to the commission DISC but only insofar as those sales entitled the DISC to commissions. There is no reason to attribute gross sales receipts to a commission DISC where the DISC was not entitled to commissions on such sales.

For the foregoing reasons, I disagree with the majority's holding that section 1.993-6(e)(2), Income Tax Regs., does not apply to the facts in this case.

SWIFT and WELLS, *JJ.*, agree with this concurring opinion.

---

BEGHE, *J.*, concurring: Having joined Judge Chabot's concurrence, I go on to observe that Judge Ruwe's analysis appears to be a much more plausible interpretation and application of section 1.993-6(e)(2), Income Tax Regs. (the paragraph (e)(2) regulation), than the majority's improvised treatment of the commissions on domestic receipts.

I also associate myself with most of the observations and much of the reasoning of Judge Halpern's dissent. But although I think it would have been preferable for the Court to have required the parties to address adequately the paragraph (e)(2) regulation issue, I do not dissent. I regard the "results" reached by the majority as our decision, in which I join, that HISC has no deficiencies in Federal income tax because it continued to qualify as a DISC for the taxable years in issue.

Because the parties made such an inadequate presentation on the paragraph (e)(2) regulation issue, I would rule for respondent on this issue. Petitioner did not carry its burden of persuasion in presenting facts and in effect conceded the

issue by not making a coherent legal argument. Therefore the Court is justified in sustaining respondent's determination that the improperly/inadvertently commissioned domestic receipts should be included in the denominator of the fraction.

Having expressed my reservations about our treatment of the domestic receipts and the paragraph (e)(2) regulation, I would advance an additional reason to support our conclusion that section 1.993-6(e)(1), Income Tax Regs. (the paragraph (e)(1) regulation), is invalid. It appears that the DISC provisions and the consolidated return regulations contemplate the kind of mismatching that occurred on the foreign sales that Hughes accounted for on the completed contract method and that HISC accounted for on the accrual method.

Hughes is the parent of an affiliated group of corporations that file consolidated returns, but HISC is not a member of that group. This is because, for consolidated return purposes, the term "includible corporation" does not include a "DISC (as defined in section 992(a)(1))." Sec. 1504(b)(7). As a result, a DISC is permitted to use a taxable year different from that of its parent and other group members. Sec. 1.1502-1(d), Income Tax Regs. Even more important, a DISC is not subject to the rules of the consolidated return regulations, see sec. 1.1502-13(a)(2), Income Tax Regs., that prevent members of a group filing a consolidated return from using different methods of accounting to create mismatches of items of income and expense on intercompany transactions. It therefore appears that the DISC provisions and the consolidated return regulations contemplate the kind of mismatching that occurred in this case.

This statutory separation of a DISC from its parent and siblings has operated in this case to require us to decide it in a vacuum, without addressing the tax treatment of the related items on the consolidated returns of the Hughes affiliated group that bracketed the fiscal years of HISC that are before us. Respondent appears to have missed the boat in failing to disallow Hughes' deduction of the commissions on the domestic receipts, and in failing to defer its deductions of the commissions on the qualified export receipts arising from the long-term contracts. As a result, the tax treat-

ment of Hughes' deductions is not before us, and respondent may well have been whipsawed.

---

HALPERN, *J.*, dissenting: The majority has taken a path that leads it to declare one regulation invalid and to reject the literal meaning of a second on the theory that the only purpose of the second is to recite the self-evident. Sec. 1.993-6(e)(1) and (2), Income Tax Regs., respectively. I disagree with the majority's approach not because I think that either result is necessarily wrong but because I think that such results may be avoidable.

Having disposed of respondent's astonishing proposition that qualified export receipts, a subset of gross receipts, are to be determined using a method of accounting different from that used to determine gross receipts, HISC would have been home free as a DISC were it not for the "commissions" from domestic sales received by HISC. Petitioner argues that those "commissions" inadvertently were included in gross income. What precisely petitioner means by that is unclear. Does petitioner mean that the domestic "commissions" inadvertently were included in gross income, when, perhaps, they should not have been included because they represented a contribution to capital or were offset by an obligation to make reimbursement? Alternatively, does petitioner mean that they were correctly included in gross income but incorrectly characterized as commissions? We do not know. The findings of fact made by the majority state only that "during the taxable year ended March 31, 1982, commissions from domestic sales * * * were paid to and reported by HISC." Majority op. p. 296. (Assumably the same was true for HISC's taxable year ended March 31, 1983, the only year for which it would make a difference.) The majority's opinion, insofar as it concerns the treatment of such "commissions" under section 1.993-6(e)(1) and (2), Income Tax Regs., is predicated on the following near-tautology: "Because Hughes paid HISC a commission on the domestic sales, it is a transaction that gave rise to a commission." Majority op. pp. 300-301. Having thus persuaded itself, without adequate analysis, that the domestic "commissions" are indeed commissions, the majority

finds itself confronted with the regulatory questions that it proceeds to answer.

If the domestic "commissions" were either not includable as gross income or not includable as commissions, then it is likely that (as with HISC's taxable year ended March 31, 1982) we could avoid any confrontation with either section 1.993-6(e)(1) or (2), Income Tax Regs.[1] I suspect that, for whatever reasons, the parties did not focus adequately on those questions.[2] I would call the parties back to assist us in better understanding the "inadvertence" of petitioner's including the domestic "commissions" in gross income. A better understanding might lead to a conclusion that would avoid a confrontation with section 1.993-6(e)(1) and (2), Income Tax Regs; we might arrive at the same bottom line (decision for petitioner), but stand on a less controversial footing. Our approach here seems to insure respondent's appeal, which, in a sense, means that we have not settled the controversy but merely passed it along. Given the all-but-repeal of the DISC provisions in 1985, we may never again be faced with the validity of section 1.993-6(e)(1), Income Tax Regs., and, thus, avoiding the question today may not simply save it for another day. Also, as stated, we have raised what I consider to be an unnecessary controversy concerning the meaning of section 1.993-6(e)(2), Income Tax Regs. I would avoid those results. Because I do not see the necessity of the results reached by the majority, I respectfully dissent.

WHALEN, *J.,* agrees with this dissent.

---

[1] Accepting arguendo that the domestic "commissions" themselves constitute an item of gross income (perhaps under the claim of right doctrine), then, if in fact that item does not constitute a commission under the commission agreement between HISC and Hughes, because HISC is not, under that agreement, entitled to any commission on domestic sales, only the item itself (and not any domestic sales gross receipts of Hughes) would be considered a gross receipt of HISC. See sec. 1.993-6(a), Income Tax Regs. Indeed, if all that is so, and, for HISC's 1983 taxable year, the aggregate "commissions" on the $13,784,333 of domestic sales receipts are no more than $2,490,242 (roughly 18 percent of such domestic sales receipts), then HISC would qualify under the 95-percent gross receipts test:

$$\frac{348{,}315{,}640 - 13{,}784{,}333 - 241{,}451{,}118}{348{,}315{,}640 + 2{,}408{,}715 - 241{,}451{,}118 - 13{,}784{,}333 + 2{,}490{,}242} = \frac{93{,}080{,}189}{97{,}979{,}146} = 95\%$$

[2] For that reason, I would not make too much of petitioner's reply brief "concession" described in majority op. note 8 that gross receipts attributable to the domestic commissions should only be included in the denominator of the gross receipts fraction if sec. 1.993-6(e)(2), Income Tax Regs., does not apply.