FMC CORPORATION AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2016–90, 20609–90.                Filed June 24, 1993.

*Stephen J. Martin* and *Geoffrey W. Haynes,* for petitioners.
*Eugene H. Ciranni* and *Bryce Kranzthor,* for respondent.

SWIFT, *Judge:* Respondent determined deficiencies in petitioners' consolidated corporate Federal income taxes as follows:

| *Year* | *Deficiency* |
|---|---|
| 1978 | $21,486,984 |
| 1980 | 457,957 |
| 1981 | 5,468,091 |
| 1982 | 761,649 |
| 1983 | 3,772,640 |
| 1984 | 38,795,649 |

Unless otherwise indicated, all chapter and section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After extensive and successful settlement negotiations on many issues (for which we commend counsel for both parties), the issues remaining for decision pertain to the domestic international sales corporation (DISC) provisions of the Code, as follows: (1) Whether industrial cranes used on oil drilling platforms (which platforms were attached to the Outer Continental Shelf of the United States in the Gulf of Mexico) were used, for purposes of section 993(c)(1)(B), "outside the United States" (continental shelf issue); (2) whether FMC Corp. (petitioner) is required, in calculating deemed distributions under section 995, to aggregate base period export receipts of a DISC that petitioner acquired in 1976 with the base period export receipts of other DISC's that petitioner owned (DISC aggregation issue); and (3) whether petitioner is required, in calculating deemed distributions under section 995, to include in its base period export receipts the base period export receipts generated by manufacturing businesses that petitioner sold during the years in issue with the base period export receipts of other DISC's that petitioner continued to own (separation of ownership issue). Each issue constitutes an issue of first impression.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioner is incorporated in the State of Delaware. Petitioner's principal place of business was in Chicago, Illinois, at the time the petition was filed. During the years in issue, peti-

tioner was the common parent of an affiliated group of corporations that filed consolidated corporate Federal income tax returns.

*Continental Shelf Issue*

In 1971, petitioner organized FMC Export Corp. (FMC Export) as a wholly owned subsidiary and as a commission DISC under the Federal income tax laws. From its organization in 1971 through the years in issue, FMC Export satisfied the general DISC requirements of section 992.

During 1978 through 1982, petitioner manufactured industrial cranes at a factory in Cedar Rapids, Iowa. FMC Export, as agent for petitioner, sold the cranes to, among others, U.S. companies which used the cranes on oil drilling platforms that were attached to the Outer Continental Shelf of the United States in the Gulf of Mexico, more than 3 miles, but less than 200 miles, from the coastline of any State, possession, or Puerto Rico (the Outer Continental Shelf). Petitioner paid commissions to FMC Export with respect to sales of petitioner's cranes.

The U.S. Government claims the exclusive right to explore and to exploit natural resources located in the Outer Continental Shelf. See Outer Continental Shelf Lands Act, ch. 345, 67 Stat. 462 (1953), 43 U.S.C. secs. 1331-1356 (1988).[1] The United States' claim of exclusive right to the exploration and exploitation of natural resources located in the Outer Continental Shelf accords with customary international law that permits countries to claim exclusive economic development rights to the natural resources of the subsoil and seabed of the respective continental shelf areas extending 200 miles outward from their coastlines. See generally 1982 United Nations Convention on the Law of the Sea, opened for signature Dec. 10, 1982, A/CONF.62/122, 21 I.L.M. 1261 (1982);[2] 2 Restatement, Foreign Relations Law of the United States 3d, secs. 601-604 (1987).

---

[1] The part of the continental shelf that extends less than 3 miles outward from the U.S. coastline is considered to be within the historic boundaries of individual States.

[2] Although the United States has not ratified the 1982 Convention on the Law of the Sea, in 1983 the United States in effect agreed to accept the substantive provisions of the Convention other than those dealing with deep-seabed mining. See Proclamation 5030, 3 C.F.R. 22-23 (1984); Statement by the President, 1983 Pub. Papers 378-379 (Mar. 10, 1983) (President Ronald Reagan's statement regarding the oceans policy of the United States).

During 1978 through 1982, although petitioner manufactured and FMC Export sold industrial cranes to purchasers for use on oil drilling platforms attached to the Outer Continental Shelf, neither petitioner nor FMC Export, nor any other subsidiary of FMC, otherwise engaged in any exploration or exploitation activities with respect to mines, oil and gas wells, or any other natural deposits on the Outer Continental Shelf.

With regard to the sale by FMC Export, as agent for petitioner, of cranes used by the purchasers on oil drilling platforms attached to the Outer Continental Shelf, petitioner paid sales commissions to FMC Export in the years indicated, as follows:

| Year | Sales commissions |
|------|-------------------|
| 1978 | $464,755 |
| 1980 | 483,934 |
| 1982 | 397,176 |

Petitioner treated the cranes as being used outside the United States and as export property. Petitioner, therefore, treated the commissions under section 994 as deductible DISC commission expenses, and petitioner deducted the commissions on its 1978, 1980, and 1982 consolidated corporate Federal income tax returns.

On audit, respondent determined that the cranes were not used by the purchasers outside the United States, that the cranes therefore did not qualify as export property for purposes of the DISC provisions, that the related commissions petitioner paid to FMC Export were not incurred in connection with the sale of export property, and that the commission expenses were not allowable deductions under section 994.

Consistent with the disallowance to FMC of the commission expenses, respondent reduced FMC Export's annual export receipts for each of the years 1978, 1980, and 1982, and respondent reduced the deemed distributions from FMC Export that FMC was required to report.

*DISC Aggregation Issue*

For a number of years prior to December 27, 1976, petitioner owned 50 percent of the stock of Ketchikan Pulp Co. (Ketchikan), a corporation engaged in timber logging, and petitioner owned 50 percent of the stock of Ketchikan International Sales Corp. (Ketchikan International), a DISC operating as Ketchikan's sales agent for the overseas sale to Japanese customers of cut timber.

For years prior to December 27, 1976, the other 50 percent of the stock of Ketchikan and of Ketchikan International was owned by Louisiana Pacific Corp. (Louisiana Pacific), a publicly owned corporation unrelated to petitioner that was engaged primarily in timber logging.

On December 27, 1976, petitioner sold its 50-percent stock interest in Ketchikan to Louisiana Pacific, and Louisiana Pacific sold its 50-percent stock interest in Ketchikan International to petitioner.

After acquiring 100-percent ownership of Ketchikan International, neither petitioner, Ketchikan International, nor any other corporation affiliated with petitioner engaged in timber logging or any other timber-related business. From December 27, 1976, until it was liquidated by FMC in 1985, Ketchikan International was inactive, and it received income only from interest. After December 27, 1976, Ketchikan International received no export income and no commission income.

During 1972 through 1984, petitioner owned 100 percent of the stock of the following additional DISC's: FMC Export, Wayne Inter-American Corp. (Wayne), Wayne International Sales Corp. (Wayne International), and Marine Colloids International, Inc. (Marine Colloids). None of these DISC's ever engaged in any timber-related business.

The parties have stipulated that the purposes for which petitioner sold to Louisiana Pacific its 50-percent stock interest in Ketchikan and acquired from Louisiana Pacific the additional 50-percent stock interest in Ketchikan International were related to legitimate business reasons. Such transactions were not based on an effort to minimize petitioner's deemed dividend distributions from its controlled DISC's.

After acquiring Ketchikan, Louisiana Pacific continued to engage in timber logging, and Louisiana Pacific sold cut timber through a subsidiary qualified as a DISC.

For 1976, for Federal income tax purposes, respondent required Louisiana Pacific to recognize its gain from the sale of its 50-percent stock interest in Ketchikan International in an amount equal to 50 percent of Ketchikan International's accumulated DISC income. See sec. 995(c). Further, in calculating Louisiana Pacific's incremental increase in its export receipts for 1976 and subsequent years (as required by certain 1976 amendments to the DISC statutory provisions which will be explained below), respondent required Louisiana Pacific to aggregate Ketchikan International's export receipts for certain specified base period years with the export receipts of its other DISC's for the base period years.[3] See sec. 995(e)(9).

In calculating, under section 995, its incremental increase in export receipts and its deemed distributions from Ketchikan International and its other DISC's for 1976 and subsequent years (as required by the same 1976 amendments to the DISC statutory provisions), petitioner did not aggregate the export receipts of Ketchikan International for certain base period years with the export receipts of petitioner's other DISC's (namely, FMC Export, Wayne, Wayne International, and Marine Colloids) for the base period years.

On audit, respondent determined that in calculating deemed distributions from petitioner's DISC's for 1976 and subsequent years, petitioner was required to aggregate Ketchikan International's export receipts for the base period years with the export receipts of petitioner's other DISC's for the base period years.[4]

---

[3] The meaning and significance of the "base period" will be explained later in this opinion.

[4] Respondent required petitioner to aggregate only 50 percent of Ketchikan International's base period export receipts because Louisiana Pacific was required to recognize 50 percent of Ketchikan International's accumulated DISC income as taxable income upon the sale to petitioner of its 50-percent interest in Ketchikan International. See sec. 995(e); sec. 1.995-7(e)(5), Income Tax Regs.

*Separation of Ownership Issue*

During the years indicated, petitioner manufactured, among other things, the following types of goods through its various corporate divisions, as follows:

| Years manufactured | Types of goods manufactured | Corporate division |
|---|---|---|
| 1972-76 | Agricultural and industrial pumps | Pump division |
| 1972-76 | Rayon and other textile fibers | Fiber products division |
| 1973-77 | Submersible electric motors | Submersible pump division |
| 1974-80 | Semiconductor devices | Semiconductor products division |

FMC Export, as agent, sold the goods indicated above that were manufactured by petitioner's various divisions.

During the years indicated, petitioner sold each of the corporate divisions listed above to purchasers unrelated to petitioner as follows:[5]

| Year sold | Corporate division | Purchaser |
|---|---|---|
| 1976 | Pump division | Indian Head, Inc. |
| 1976 | Fiber products division | Avtex Fibers, Inc. |
| 1977 | Submersible pump division | Kobe, Inc. |
| 1980 | Semiconductor products division | Siemens Corp. |

The sales occurred for legitimate business reasons.

After selling each corporate division, neither petitioner nor any of its affiliated corporations continued to engage in any business related to the businesses or corporate divisions that were sold. The purchasers continued to engage in the businesses acquired from petitioner and to sell the manufactured equipment through qualified DISC's.

As the sale of the corporate divisions caused a separation of the ownership of the underlying businesses from the ownership of the stock of FMC Export, the purchasers of each of the corporate divisions were required to aggregate (in their respective calculations of their base period export receipts)

---

[5] The record does not indicate clearly the form through which these sales occurred. The stipulation between the parties simply indicates that the corporate divisions were sold without clarifying whether it was only the underlying assets or the operating corporate divisions in their entirety that were sold.

the appropriate base period export receipts of each division. See sec. 995(e)(9).

In calculating, for years subsequent to the sale of each of the corporate divisions, its base period export receipts, its increased export receipts, and its deemed distributions from FMC Export, petitioner did not aggregate the base period export receipts of each corporate division.

Even though each corporation that purchased a corporate division from petitioner was required to aggregate the base period export receipts of FMC Export that were generated by each corporate division or business that it had purchased from petitioner, respondent on audit determined that in calculating petitioner's increased export receipts and deemed distributions for 1976 and subsequent years, petitioner also was required to aggregate the export receipts of FMC Export that were generated by each of the sold corporate divisions in the base period years.

OPINION

*Continental Shelf Issue*

Special tax benefits are available to DISC's in order to encourage U.S. companies to increase exports. *L&F Intl. Sales Corp. v. United States,* 912 F.2d 377, 377-378 (9th Cir. 1990); *Hughes Intl. Sales Corp. v. Commissioner,* 100 T.C. 293, 297 (1993).

A qualified DISC's earnings and profits are not subject to Federal income taxes at the corporate level. Sec. 991. In general, a portion of a DISC's "qualified export receipts" is deemed distributed to the DISC shareholders in the year earned by the DISC. Sec. 995(b). The DISC's remaining annual "qualified export receipts" are not subject to Federal income tax at the shareholder level until the receipts are actually distributed to the DISC shareholders, until a shareholder disposes of his or her stock in a taxable transaction, or until the corporation ceases to qualify as a DISC. See secs. 995(b) and (c), 996(a)(1); *Brown-Forman Corp. v. Commissioner,* 94 T.C. 919, 925 (1990), affd. 955 F.2d 1037 (6th Cir. 1992).

Under section 993(a)(1)(A), receipts from the sale, exchange, or other disposition of export property represent one type of qualified export receipts, and under section 994, commissions paid to a DISC with respect to such activities

involving export property represent income to the DISC and deductible business expenses to the related supplier. Sec. 994(a).

As defined under section 993(c)(1)(B), export property is property that is sold or leased by a DISC for use, consumption, or disposition "outside the United States". Section 993(c)(1)(B) provides as follows:

SEC. 993. DEFINITIONS.

(c) EXPORT PROPERTY.—

(1) IN GENERAL.—For purposes of this part, the term "export property" means property—

\* \* \* \* \* \* \*

(B) held primarily for sale, lease, or rental, in the ordinary course of trade or business, by, or to, a DISC, for direct use, consumption, or disposition outside the United States, \* \* \*

Under section 7701(a)(9), the term "United States" is defined generally to include only the States and the District of Columbia. Section 7701(a)(9) provides as follows:

SEC. 7701. DEFINITIONS.

(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

\* \* \* \* \* \* \*

(9) UNITED STATES.—The term "United States" when used in a geographical sense includes only the States and the District of Columbia.

Further, it is established generally that the boundaries of States of the United States adjacent to the oceans and the Gulf of Mexico extend only 3 miles into the oceans and the Gulf of Mexico, 43 U.S.C. sec. 1312 (1988), and under section 993(g), for specific purposes of the DISC provisions, the term "United States", when used in a geographical sense, is stated to include the possessions of the United States and the Commonwealth of Puerto Rico. Section 993(g) provides—

SEC. 993. DEFINITIONS.

(g) UNITED STATES DEFINED.—For purposes of this part, the term "United States" includes the Commonwealth of Puerto Rico and the possessions of the United States.

See also sec. 1.993-7, Income Tax Regs.

With regard specifically to activities on the Outer Continental Shelf relating to mines, oil and gas wells, and other

natural deposits, for purposes of the provisions of chapter 1, entitled "Normal Taxes and Surtaxes" (which chapter includes the DISC provisions), the term "United States" is defined in section 638 to include adjacent territorial waters, seabed, and subsoil of the submarine areas with regard to which the United States has exclusive exploration and exploitation rights. Section 638 provides as follows:

SEC. 638. CONTINENTAL SHELF AREAS.

For purposes of applying the provisions of this chapter (including sections 861(a)(3) and 862(a)(3) in the case of the performance of personal services) with respect to mines, oil and gas wells, and other natural deposits—

(1) the term "United States" when used in a geographical sense includes the seabed and subsoil of those submarine areas which are adjacent to the territorial waters of the United States and over which the United States has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources; * * *

Petitioners argue, among other things, that because the definitions of "United States" in sections 7701(a)(9) and 993(g) make no specific mention of the territorial waters or of the Outer Continental Shelf area, it was intended, for DISC purposes, to treat the Outer Continental Shelf area adjacent to the United States as "outside" the United States. We disagree.

As we read and understand the above statutory scheme, section 993(g) merely expands the definition of "United States" under section 7701(a)(9) to also include, for purposes of the DISC provisions, the possessions of the United States and the Commonwealth of Puerto Rico. It does not override or limit the application of the special geographical definition of "United States" under section 638 (which includes U.S. territorial waters and the Outer Continental Shelf of the United States) in those specific situations (such as the instant case) where the underlying use of the property relates to mines, oil and gas wells, or other natural deposits.

In interpreting statutory language, we "look first to its plain meaning." *Price v. Commissioner,* 887 F.2d 959, 963 (9th Cir. 1989), revg. an order of this Court. If the statutory language is unambiguous, it is controlling unless Congress has clearly expressed a contrary intention. *Id.* at 963-964.

The key operative statutory language in our analysis is the above-quoted language under the DISC provisions of section 993(c)(1)(B). Thereunder, among other things, it is expressly stated and mandated that (in the analysis of what constitutes export property for DISC purposes) the *use* to which property is put by the purchasers or lessees of the property is controlling. Under those DISC provisions, if the *use* of the cranes *by the purchasers* is regarded as not outside the United States, the cranes cannot be treated as export property.

Paraphrasing the relevant language of section 993(c)(1)(B), the cranes at issue in this case will be regarded as export property only if the cranes were sold by FMC Export for use by the purchasers of the cranes outside of the United States. The fact that petitioner and FMC Export only sell or lease the cranes (and do not themselves engage in the specified activity) does not end the analysis. The statutory DISC provisions require us to go further and to consider the use to which the cranes were put by the purchasers of the cranes. See also sec. 1.993-3, Income Tax Regs., which emphasizes throughout that it is the ultimate use to which property is put that is controlling in determining whether property is export property.

For purposes of this case, the focus of section 993(c)(1)(B) is on the *use* to which the cranes was put by the purchasers of the cranes—more specifically, what was the nature of the use and the location of the use.

Applying this test to the particular facts of this case, the nature of the use of the cranes by the purchasers is clear and undisputed—namely, to provide assistance on drilling platforms in drilling for oil. That use triggers the special and broader definition of the "United States" under section 638 that is expressly applicable to all determinations, under chapter 1, as to the location of oil and gas wells and other natural deposits. Thereunder, as explained, oil drilling activities (such as the use of the cranes at issue) occurring on or over the Outer Continental Shelf are regarded as occurring inside the United States.

Petitioners argue that the broader definition of "United States" under section 638 applies only to determine the Federal income tax consequences of income derived directly from the exploration and exploitation of mines, oil and gas wells,

and other natural deposits, and petitioners argue that section 638 does not apply to income from the mere sale by a DISC of property, where the DISC (such as FMC Export), after the sale, had no direct involvement in the actual exploration and exploitation of the natural deposits.

Petitioners cite a portion of the 1969 legislative history of section 638 in support of their argument that section 638 applies only in determining the Federal income tax consequences of income derived directly from the exploration or exploitation of natural deposits, as follows:

Present law is not explicit as to whether for purposes of the exploration for, or exploitation of, natural resources in the continental shelf area of a country over which the country exercises tax jurisdiction under the principles of international law, that area is considered for U.S. tax purposes as a part of the country.

\* \* \* The development of natural resources in the continental shelf areas of the world makes the status of these areas for tax purposes of increasing importance. This status is important, for example, in determining the source of income from mining activities conducted in continental shelf areas and in the application of the foreign tax credit with respect to this income. Accordingly, the committee believes it appropriate to clarify the status of continental shelf areas with regard to the application of the income tax provisions of the code to natural resource activity.

[S. Rept. 91-552 (1969), 1969-3 C.B. 423, 543.]

We discern nothing in the above legislative history that indicates an intent contrary to the plain meaning of section 993(c)(1)(B) and section 638, as discussed above. Further, as stated by the U.S. Court of Appeals for the Ninth Circuit—

When the literal interpretation of a statute is reasonable, a court must be cautious in considering legislative history offered in support of a contrary position especially when that statute is contained in the Internal Revenue Code. "Under these circumstances a second interpretation should be accepted . . . only if the evidence is very strong which will usually require explicit language." \* \* \* [*Feldman v. Commissioner*, 791 F.2d 781, 783 (9th Cir. 1986) (quoting *Heppner v. Alyeska Pipeline Service Co.*, 665 F.2d 868, 873 (9th Cir. 1981)), affg. 84 T.C. 1 (1985); citation omitted.]

Petitioners rely on the U.S. Claims Court's opinion in *Ocean Drilling & Exploration Co. v. United States*, 24 Cl. Ct. 714 (1991), affd. per curiam 988 F.2d 1135 (Fed. Cir. 1993), in further support of their interpretation of section 638.[6]

---

[6] The U.S. Claims Court was redesignated the U.S. Court of Federal Claims, effective Oct. 29, 1992, pursuant to the Federal Courts Administration Act of 1992, Pub. L. 102-572, secs. 901-

Although the issue in *Ocean Drilling & Exploration Co. v. United States, supra,* pertained to section 953 (relating to the source of income from the insurance of United States risks) rather than to the DISC provisions, petitioners argue that the issue in *Ocean Drilling & Exploration* is analogous to the issue herein.

In *Ocean Drilling & Exploration Co. v. United States, supra,* the Claims Court considered whether income derived by the taxpayer from the insurance of oil and gas drilling activity on the Outer Continental Shelf constituted "income derived from the insurance of United States risks" within the meaning of section 953. Under section 953(a), income is considered to be derived from the insurance of United States risks if, among other things, income is derived from the insurance of risks arising out of activity occurring inside the United States. Section 1.638-1(f), *Example (8)*, Income Tax Regs., indicates that for purposes of the insurance source-of-income rules of section 953, the definition of "United States" under section 638 applies. Thus, under section 638 and the regulations thereunder, the insurance of oil and gas drilling activity on the Outer Continental Shelf would represent the insurance of risks arising out of activity occurring inside the United States.

The Claims Court declined to follow the example in section 1.638-1(f), Income Tax Regs., and it concluded that section 638 applied in determining the income tax consequences of income derived directly from the exploration or exploitation of mines, oil and gas wells, and other natural deposits, and that as an insurer the taxpayer was not directly involved in such activities. The Claims Court, therefore, held that for purposes of section 953, insurance policies issued with respect to oil and gas drilling activity on the Outer Continental Shelf do not constitute the insurance of risks arising out of activity occurring inside the United States.

We believe *Ocean Drilling & Exploration Co. v. United States, supra,* is distinguishable. The source-of-income rules at issue in that case under section 953 had no language comparable to the specific language of section 993(c)(1)(B), discussed above, that, among other things, expressly provides that the *use* of the property by the purchaser (to whom the

---

911, 106 Stat. 4516-4520.

DISC has sold property) will govern whether the property is export property. As we have explained, that language under section 993(c)(1)(B) makes it clear that it is not merely the activity of the DISC that governs the characterization of property as export property. Rather, under section 993, the use of the property by the purchaser of the property from the DISC is equally important and is independently controlling. Thus, under section 993, whether or not the DISC is directly involved in the exploration and exploitation of mines, oil and gas wells, and other natural deposits clearly is not determinative, and the analysis of *Ocean Drilling & Exploration Co. v. United States, supra,* is not applicable.

Further, the regulations under the insurance provisions of section 953 expressly state that for purposes of the source-of-income rules thereunder the term "United States" is used "in a geographical sense and includes only the States and the District of Columbia." Sec. 1.953-2(a)(3), Income Tax Regs. As noted above, the specific provisions of the DISC statutory and regulatory provisions defining the term "United States" do not contain the word "only". See sec. 993(g); sec. 1.993-7, Income Tax Regs. For that reason, there does not exist in the instant case the direct conflict (with regard to the definition of "United States") between the DISC provisions and the provisions of section 638 that existed in *Ocean Drilling & Exploration Co. v. United States, supra,* between the insurance source-of-income rules of section 953 and the provisions of section 638.[7]

In the instant case, the cranes were sold by FMC Export to domestic U.S. companies for use on oil drilling platforms attached to the Outer Continental Shelf. Under section 638, the oil drilling activities of those companies are not treated for Federal income tax purposes as being outside the United States, and the cranes are not treated as having been used outside the United States.

We conclude that the cranes are not to be treated as export property and that commissions paid by petitioner to FMC Export with regard to the sale of the cranes do not constitute deductible DISC commission expenses under section 994.

---

[7] By distinguishing *Ocean Drilling & Exploration Co. v. United States,* 24 Cl. Ct. 714 (1991), affd. per curiam 988 F.2d 1135 (Fed. Cir. 1993), from the instant case, we in no way intend to imply that we agree with either the analysis or conclusion reached therein.

*DISC Aggregation Issue*

By certain amendments to the DISC provisions of the Code, Congress in 1976 limited the tax deferral available to DISC's by providing, among other things, that DISC's would be entitled to continue receiving tax deferral only to the extent that DISC export receipts in each year increase over the average yearly export receipts of a 4-year base period. Tax Reform Act of 1976, Pub. L. 94-455, sec. 1101, 90 Stat. 1520, 1655-1660.

The 4-year base period (for purposes of determining the post-1975 increase in DISC export receipts for the years 1976 through 1979) consists of 1972, 1973, 1974, and 1975. For years after 1979, the beginning year of the base period moves forward 1 year for every year. Thus for 1980, the 4-year base period consists of 1973, 1974, 1975, and 1976.

The 1976 amendments to the DISC provisions and the calculations required thereunder of the current and average base period export receipts include a special rule that applies when more than one member of a controlled group (as defined in section 993(a)(3)) qualifies as a DISC for a particular year. Generally, under section 995(e)(8), in calculating increased export receipts from multiple DISC's, a controlled group is required to aggregate the export receipts of each of its controlled DISC's for the current year as well as for each of the base period years of each DISC.

Section 995(e)(8) provides as follows:

If more than one member of a controlled group (as defined in section 993(a)(3)) for the taxable year qualifies as a DISC, then subsection (b)(1)(E), this subsection, and subsection (f) shall each be applied in a manner provided by regulations prescribed by the Secretary by aggregating the export gross receipts and taxable income of such DISCs for the taxable year and by aggregating the export gross receipts of such DISCs for each taxable year in the base period.

Pursuant to the specific mandate in the above statute, the Treasury has promulgated legislative regulations under section 995(e)(8), in which the requirement that the export gross receipts of *each* DISC in a controlled group are to be included in the aggregation of export receipts for the current year and for the base period years is expressly stated, as follows:

(d) *Controlled group*—(1) *General rule.* Where more than one member of a controlled group of corporations (as defined in section 993(a)(3) and section 1.993-1(k)) qualifies or is treated as a DISC, special rules are used to calculate the nonincremental distribution. In such a case, the fraction described in paragraph (d)(2) of this section to compute the nonincremental distribution is the aggregate of the adjusted base period export gross receipts over the aggregate of the computation year export gross receipts for the computation year of *every* member DISC within the controlled group. This fraction is multiplied by the aggregate adjusted taxable income of *each* member DISC within the controlled group. The computation of the nonincremental distribution described in this paragraph applies to shareholders of a DISC that is a member of a controlled group even though such shareholder is not a related person within the meaning of section 1.993-1(a)(6). [Sec. 1.995-7(d)(1), Income Tax Regs.; emphasis added.]

Petitioners acknowledge the significant weight to be given legislative regulations, but petitioners argue that neither the statute nor the regulations explicitly require aggregation in the specific situation presented to us in this case (namely, where the underlying trade or business of a DISC is separated from the DISC itself, where the DISC, after it is acquired by the new owner, ceases any active export activity, and where the new owner of the DISC and the new owner's other controlled DISC's did not, before acquisition of the DISC, and do not after acquisition of the DISC, engage in the same or related export trade or business that the DISC engaged in prior to its acquisition).

Petitioners emphasize the following points in making their argument: (1) Under section 995(e)(9), the base period export receipts of the DISC (namely, Ketchikan International) have already been aggregated with the base period export receipts of the new owner (namely, Louisiana Pacific) that acquired the DISC's export trade or business, (2) aggregation, therefore, of the DISC's base period's export receipts with the base period export receipts of other members of the controlled group to which the DISC now belongs (namely, petitioner and its related DISC's) will result in double counting of such base period export receipts, and (3) Congress intended to require aggregation of export receipts of commonly controlled DISC's only in abusive situations where the taxpayer is attempting to circumvent the deemed distribution rules of section 995 or is attempting to minimize the amount of its deemed distributions to be calculated under section 995.

In support of this argument, petitioners cite the legislative history of section 995 which discusses the congressional objectives in enacting the special rules contained in sections 995(e)(8), (9), and (10), as follows:

The purposes of these rules are, first, to insure that in every year the base period export gross receipts which are attributable to a DISC for purposes of deemed distributions in the current year are appropriately matched with the current period export receipts of the DISC and, second, to prevent taxpayers from creating multiple DISCs, or trading DISCs, to reduce deemed distributions attributable to base period export gross receipts. * * * [H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 958; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 333.]

Based on the above legislative history, petitioners argue that respondent's regulation, by interpretation, should be limited to instances where taxpayers with control of multiple DISC's intentionally acquire or sell a DISC, or shift export business from one DISC to another for the purpose of reducing the amount of deemed distributions to be calculated under section 995(e)(8). Petitioners find further support for this interpretation in the following additional legislative history:

*Controlled group.*—The bill provides that if one or more members of a controlled group of corporations (as defined in sec. 993(a)(3) to include all corporations with 50 percent or more common ownership) qualify as a DISC in the current or base period years, the amount deemed distributed as taxable income attributable to adjusted base period export gross receipts to the common shareholder of the DISCs * * * is to be determined by aggregating taxable income, current year export gross receipts, and base period export gross receipts of the commonly owned DISCs. This aggregation is to be accomplished under regulations prescribed by the Secretary and is to be reflected on a pro rata basis (i.e., according to taxable income) in each DISC for purposes of determining the deemed distribution from each DISC. *The Secretary's regulations thus are not intended to require aggregation of commonly owned DISCs for all purposes (including for purposes of meeting the qualifications of a DISC). Rather, this aggregation is to be required only to the extent necessary so that a taxpayer which exports through more than one related DISC (in the current year or the base period), cannot gain any advantage by increasing its exports in one DISC or the other, since the base period of both DISCs are taken into account in determining the amount of the deemed distribution of taxable income attributable to base period export gross receipts.* [H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 958; emphasis added.]

See also S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 333-334.

Respondent counters that under the 1976 amendments to the DISC provisions, Congress intended to require the aggregation of DISC export receipts for purposes of calculating increased annual deemed distributions in all cases in which taxpayers have control of multiple DISC's, either during the current year or during any of the base period years, regardless of whether the taxpayer was intending to shift export business from one DISC to another to lower the deemed distribution calculation. We agree with respondent.

The legislative history of section 995(e)(8), quoted above, suggests that the aggregation requirement under section 995(e)(8) applies whenever one or more members of a controlled group qualify as a DISC in the current or base period years. There is no indication in section 995 or in the legislative history of section 995 that Congress intended for respondent to make a case-by-case determination of whether a taxpayer's control of multiple DISC's during the current or base period years frustrates the purposes Congress sought to achieve by enacting section 995(e)(8) (namely, preventing mismatch of export receipts in current and base period years and preventing a circumvention of the deemed distribution rules). Further, we do not read the enumeration in the legislative history of the congressional objectives in enacting section 995(e)(8) as limiting the scope of the aggregation requirement under section 995(e)(8).

We reject petitioners' argument that the aggregation requirement under section 995(e)(8) does not apply in the instant case because petitioners did not have control over Ketchikan International during any of the base period years. As indicated, the provisions of section 995(e)(8), and the legislative regulations promulgated thereunder, explicitly require that the export receipts of commonly controlled DISC's are to be aggregated when control of such DISC's exists during the current year. Sec. 1.995-7(a), Income Tax Regs.; see also H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 958; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 333-334.

We hold that in calculating annual deemed distributions for the years in issue, petitioner is required to aggregate Ketchikan International's base period export receipts with the base period export receipts of petitioner's other DISC's.

*Separation of Ownership Issue*

As indicated, in the Tax Reform Act of 1976, Pub. L. 94-455, sec. 1101, 90 Stat. 1520, 1655-1660, Congress enacted several rules (comprising section 995(e)(8), (9), and (10)) that are intended to prevent taxpayers from shifting export business from one DISC to another and thereby manipulating the calculation of the increased level of export activity of the DISC in the post-1976 years. Section 995(e)(9) provides that whenever there is a "separation of the ownership" of a DISC from the trade or business that generated the DISC's export receipts, for purposes of the deemed distribution rules, the owner of the trade or business must include in its base period export receipts the DISC's base period export receipts generated by that trade or business. Section 995(e)(9) provides in relevant part as follows:

(9) SPECIAL RULE WHERE THE OWNERSHIP OF DISC STOCK AND THE TRADE OR BUSINESS GIVING RISE TO EXPORT GROSS RECEIPTS OF THE DISC ARE SEPARATED.—

(A) IN GENERAL.—If, at any time after the beginning of the base period, there has been a separation of the ownership of the stock in the DISC from the ownership of the trade or business which (during the base period) produced the export gross receipts of the DISC, then the persons who own the trade or business during the taxable year shall be treated as having had additional export gross receipts during the base period attributable to such trade or business.

A separation of ownership occurs, for example, when a taxpayer sells the underlying trade or business that generated DISC receipts but retains ownership of the DISC. See sec. 1.995-7(e), Income Tax Regs.

Section 995(e)(9) does not specifically address the tax consequences to the taxpayer retaining ownership of a DISC when a separation of the ownership of the DISC and the underlying trade or business occurs. The interpretative regulations under section 995(e)(9), however, expressly indicate that, for purposes of the deemed distribution rules, after a separation occurs of the ownership of a DISC and of the underlying trade or business that generated the DISC's export receipts, the taxpayer retaining ownership of the DISC also is required to include in its base period export receipts the DISC's base period export receipts. Sec. 1.995-7(e)(1), Income Tax Regs. The regulations further indicate that this require-

ment applies notwithstanding the fact that there may be a double counting of the DISC's base period export receipts (because, as indicated, the new owner of the trade or business is also required to include those same base period export receipts in the base period export receipts of any DISC in which the new owner has an interest). *Id.*

With regard to this potential for double counting of base period export receipts, section 1.995-7(e)(1), Income Tax Regs., provides as follows:

If, at any time after the beginning of the base period of a DISC, there has been a separation of the ownership of the stock in that DISC from the ownership of a trade or business that produced export gross receipts of the DISC, the persons who own the trade or business during the taxable year are treated as having in any DISC in which they have (or acquire) a direct or indirect interest additional export gross receipts attributable to the trade or business for purposes of computing base period export gross receipts. Notwithstanding the separation, the base period export gross receipts remain with the DISC after separation and are taken into account by shareholders of the DISC (whether or not there are new shareholders of the DISC as a result of the separation) in computing the adjusted base period export gross receipts of the DISC for taxable years beginning prior to the year in which the separation occurs.

Petitioners contend that Congress intended for the Secretary to require double counting of a DISC's base period export receipts only in certain cases—namely, in cases in which a taxpayer's shifting of export business from one DISC to another causes a mismatch of the DISC's base period export receipts with its current year export receipts or where such shifting circumvents the deemed distribution rules. Petitioners contend, therefore, that the regulation is invalid because the regulation is too broad and is contrary to the intent of Congress.

As indicated, section 1.995-7(e)(1), Income Tax Regs., is an interpretative regulation promulgated by the Secretary pursuant to Congress' general grant of authority under section 7805(a), which authorizes the Secretary to "prescribe all needful rules and regulations". That regulation, therefore, is entitled to less judicial deference than that given to regulations promulgated pursuant to a specific grant of authority. *United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24 (1982); *L&F Intl. Sales Corp. v. United States,* 912 F.2d 377, 380 n.2 (9th Cir. 1990).

'In determining whether an interpretative regulation is reasonable, courts generally consider the relevant statutory language as well as the legislative history and purpose of the statute. *United States v. Vogel Fertilizer Co., supra* at 26; *Bolton v. Commissioner,* 694 F.2d 556, 561 (9th Cir. 1982), affg. 77 T.C. 104 (1981).

The legislative history of section 995(e)(9) specifically addresses the possibility of double counting of the base period export receipts of a DISC by the owner of the DISC and also by the owner of the trade or business that has generated the DISC export receipts, as follows:

The special rule requires that a person owning the underlying trade or business during the taxable years after the separation of the trade or business from the DISC be treated as having, in any DISC in which the owner of the trade or business has an interest, an amount of additional export gross receipts for base period years equal to export gross receipts in base period years of the DISC attributable to that trade or business.

The effect of this provision is to provide a double attribution of base period export gross receipts in cases where a DISC is separated from the underlying trade or business through a tax-free reorganization or through a sale of the underlying trade or business. In these cases the base period export gross receipts of the DISC also remain with the DISC and are to be taken into account by the shareholders of the DISC (whether or not the DISC has acquired new shareholders in a tax-free reorganization) in computing adjusted base period export gross receipts of the DISC for years prior to the reorganization or sale. [H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 695, 959; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 334; fn. ref. omitted.]

In light of the specific mention of the possibility of double counting (once by the new owner of the underlying trade or business and once by the owner of the DISC) of export receipts in the legislative history of section 995(e)(9), we conclude that section 1.995-7(e)(1), Income Tax Regs., provides a reasonable interpretation of section 995(e)(9) and is valid. See also 12 Mertens, Law of Federal Income Taxation, sec. 45F.208, at 268 (1992).

We hold that for purposes of the deemed distribution rules, petitioner must include in its base period export receipts the base period export receipts generated by FMC Export, includ-

ing those attributable to corporate divisions of petitioner that were sold by petitioner prior to and during the years in issue.

*Decisions will be entered under Rule 155.*