154 T.C. No. 3

UNITED STATES TAX COURT

ADAMS CHALLENGE (UK) LIMITED, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4816-15.                    Filed January 8, 2020.

P is a U.K. private limited liability company whose sole income-producing asset for the years at issue was a multi-purpose support vessel. The vessel was chartered by a U.S. company to assist in decommissioning oil and gas wells and removing debris on portions of the U.S. Outer Continental Shelf (OCS) in the Gulf of Mexico. During 2009-2011 petitioner derived gross income of $45 million from the charter.

Foreign corporations are subject to Federal income tax on income "effectively connected with the conduct of a trade or business within the United States." I.R.C. sec. 882(a)(1). Generally, the term "United States" does not include the OCS. See I.R.C. sec. 7701(a)(9). However, I.R.C. sec. 638 provides that, for purposes of applying Federal income tax provisions "with respect to mines, oil and gas wells, and other natural deposits," the term "United States" includes "the seabed and subsoil of those submarine areas" within the OCS.

The bilateral income tax treaty (Treaty) between the United States and the U.K. provides that a U.K. enterprise shall not be subject to Federal income tax unless it conducts business in this country through a U.S. "permanent establishment." Treaty art. 7(1). An enterprise is deemed to have a U.S. permanent establishment "where activities are carried on offshore * * * in connection with the exploration * * * or exploitation * * * of the sea bed and sub-soil and their natural resources." Treaty art. 21(1).

Held: P's activities were conducted on the OCS "with respect to * * * oil and gas wells," I.R.C. sec. 638, and its activities were "related to the * * * exploitation of * * * oil and gas wells," sec. 1.638-1(c)(4), Income Tax Regs. P was therefore engaged in a trade or business within the United States, and its activities were effectively connected with that U.S. trade or business. See I.R.C. sec. 882(a)(1). P's charter income was thus subject to Federal income tax unless exempted by the Treaty.

Held, further, P's activities were carried on offshore "in connection with the * * * exploitation * * * of the sea bed and sub-soil and their natural resources" under article 21 of the Treaty. P is therefore deemed to have a U.S. permanent establishment, and the Treaty does not exempt its charter income from Federal income tax.

Andrius R. Kontrimas and Robert C. Morris, for petitioner.

William D. White, Richard A. Rappazzo, and Russell S. Shieldes, for respondent.

# OPINION

LAUBER, <u>Judge</u>:  Petitioner is a company incorporated under the laws of the United Kingdom (U.K.).  For the tax years at issue petitioner's only income-producing asset was a multi-purpose support vessel.  A U.S. firm chartered petitioner's vessel to perform work decommissioning oil and gas wells and removing hurricane-related debris on portions of the U.S. Outer Continental Shelf (OCS) in the Gulf of Mexico.  From this charter petitioner during 2009-2011 earned income of about $45 million, most of which it treated as exempt from Federal income tax.

Before the Court are petitioner's motion for summary judgment and a cross-motion for partial summary judgment filed by the Internal Revenue Service (IRS or respondent).  These motions require us to decide whether petitioner's charter income was subject to tax under the Internal Revenue Code (Code)[1] and the bilateral income tax treaty between the United States and the U.K. (Treaty).[2]  Concluding that petitioner's charter income was effectively connected with the conduct of a

---

[1]Unless otherwise indicated, all statutory references are to the Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All monetary amounts are rounded to the nearest dollar, and all percentages are rounded to the nearest percentage point.

[2]Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and on Capital Gains, UK.-U.S., July 24, 2001, T.I.A.S. No. 13,161 (entered into force Mar. 31, 2003).

U.S. trade or business and that it was not exempted by the Treaty, we will grant respondent's motion for partial summary judgment and deny petitioner's motion.

Background

The following facts are based on the parties' motion papers, the stipulation of facts, and the attached exhibits. During the tax years at issue petitioner had its registered office and mailing address in Northampton, England.

A.    The Challenge Vessel

Petitioner was formed in 2006 as a private limited liability company under U.K. law. It is a subsidiary of a Bermuda entity wholly owned by Khalifa A. Algosaibi Diving and Marine Technical Services Co., a Saudi Arabian branch of a Bahraini entity. Petitioner is the registered owner of a multipurpose support vessel, the M.V. Adams Challenge (Challenge Vessel), which was placed in service on January 1, 2009. During 2009-2011 the Challenge Vessel was petitioner's only income-producing asset.

The Challenge Vessel was equipped with state-of-the-art specialized systems. These included a "class 2 dynamic positioning system," a nine-man "saturation diving system," a helipad, and a hydraulic deck crane capable of lifting 100 tons. A dynamic positioning system enables a vessel to maintain a reasonably stationary position above an underwater worksite. The vessel plants transponders on

the sea floor, then triangulates data from those transponders to keep its position stable over a particular spot. A saturation diving system enables divers to work at greater depths for longer periods. Divers live in a sealed, pressurized chamber that is lowered to working depth. This permits the divers to be "decompressed" only once at the end of their tour of duty, thus reducing the risk of illness. Saturation diving is a highly specialized form of diving. In 2015 only 336 commercial divers were recognized by the U.S. Coast Guard as regulated saturation divers.[3]

B.    The Time Charter

EPIC Diving & Marine Services, LLC (EPIC), is an oil and gas services company that specializes in decommissioning oil and gas wells and related activities. In early 2009 EPIC was planning to bid on a project in the Gulf of Mexico, but its existing fleet did not have the capacity to complete the project. EPIC chartered the Challenge Vessel to fill this gap. It selected the Challenge Vessel because it was a brand new vessel with the specialized equipment necessary to execute EPIC's intended scope of work.

On May 15, 2009, EPIC and petitioner entered into a standard time charter for the Challenge Vessel. Under a time charter a vessel is hired for an agreed-

---

[3]See Commercial Diving Operations, 80 Fed. Reg. 9152, 9160 (Feb. 19, 2015) (to be codified at 46 C.F.R. pts. 8 and 197).

upon period, as opposed to a voyage charter, where a vessel is hired to complete a particular trip. The charter was memorialized on a standard Baltic and International Maritime Council form. Various addenda were added to the charter during 2009 and 2010, and the Challenge Vessel operated at all times consistently with the terms of the charter as thus revised. At no time were petitioner and EPIC partners or agents of one another.

The charter specified payment to petitioner of a flat daily rate (adjusted from time to time) plus a daily meal fee of $70 for each member of the Challenge Vessel maritime crew.[4] Petitioner received this payment regardless of whether the ship was engaged in operations, in transit between work sites, or in port between assignments. The charter initially recited that no taxes were due in the United States. As of October 13, 2010, the charter was amended to state that "Owners [viz., petitioner and its affiliates] are responsible for any taxes, including U.S. taxes owed as a result of income to the Owners under the Charter Party."

The Challenge Vessel had berths for 98 workers. Under the time charter petitioner contracted to provide a marine crew of 28, including the master, mates, engineers, and technical officers. Crew members were furnished by two of peti-

---

[4]EPIC also paid petitioner a mobilization fee of $750,000 to move the Challenge Vessel from Gibraltar to the Gulf of Mexico. Respondent does not contend that petitioner was taxable on this mobilization fee.

tioner's affiliates, Adams Offshore Services, Ltd., and Adams Offshore, WLL, which also supplied engineering, procurement, and technical services relating to the charter. EPIC generally had between 40 and 62 workers on board, including EPIC employees, subcontractors, and representatives of EPIC's clients.

The Challenge Vessel and its marine crew shared responsibility with EPIC for deepwater operations. Crew members were responsible for operation of the hydraulic deck crane and maintenance of all vessel equipment, including the saturation diving system when it was not in active use by EPIC's divers. Although EPIC generally had responsibility for all subsurface operations, the master of the Challenge Vessel was authorized to suspend all diving activity for safety reasons, e.g., because of adverse weather or electrical problems.

EPIC entered into contracts with oil and gas companies to perform various decommissioning services on oil and gas rigs within the OCS. Holders of Federal offshore leases, including the companies with which EPIC contracted, are required to decommission and remove equipment for terminated or non-producing leases and are subject to the decommissioning requirements of the Department of the Interior (Interior Department). See 30 C.F.R. pt. 250, subpt. Q, Decommissioning Activities. Hurricanes during 2004-2008 caused damage to oil and gas facilities in the Gulf of Mexico. In September 2010 the Interior Department issued a notice

providing lessees with guidance about their decommissioning obligations in the wake of hurricane damage.[5]

During 2009-2011 EPIC used the Challenge Vessel for work on 11 projects in various "blocks" within the Gulf of Mexico. Each project site was within 200 nautical miles of the coast of Louisiana or Texas, within the OCS. The Federal offshore lease underlying each "block" expressly required compliance with the Interior Department's decommissioning regulations, including the removal of all structures upon termination of the lease.

The projects on which the Challenge Vessel worked involved decommissioning of oil and gas facilities, including wells and pipelines. Specific tasks included excavating around damaged rigs, severing metal components from toppled platforms, plugging abandoned wells, and removing metal debris from the seabed. None of the sites was actively producing oil or gas at the time. At most sites active production had ceased several years previously, and at one site no oil or gas was ever produced. At no time did EPIC employ the Challenge Vessel to explore for oil or gas.

---

[5]See Dep't of the Interior, NTL No. 2010-G05, Notice to Lessees and Operators of Federal Oil and Gas Leases and Pipeline Right-of-Way Holders in the Outer Continental Shelf, Gulf of Mexico OCS Region (Sept. 15, 2010) (Interior Department Notice).

The marine crew maintained logs to record how the Challenge Vessel spent its time during the charter. The logs divide that time into four categories: work, port, transit, and "other." Work time reflected active use of the vessel at project sites; port time reflected hours spent in harbor resupplying or maintaining the vessel; transit time reflected hours moving the vessel between port(s) and project sites; "other" time was a catchall that included hours the vessel was at sea but idle because of bad weather. The logs show that the vessel's time was divided as follows:

| Year | Work | Port | Transit | Other |
|------|------|------|---------|-------|
| 2009 | 85% | 6% | 2% | 6% |
| 2010 | 64% | 22% | 4% | 10% |
| 2011 | 61% | 24% | 7% | 7% |

At EPIC's direction the Challenge Vessel departed for Mexico on August 11, 2011. It remained outside the United States (including the OCS) for the remainder of that year.

C.    Tax Filings and IRS Examination

Petitioner did not file a timely Federal income tax return for 2009 or 2010. On April 9, 2014, the IRS prepared a substitute for return for each year. See sec. 6020(b). On December 13, 2013, petitioner filed with the IRS office in Houston, Texas, a delinquent Form 1120-F, U.S. Income Tax Return of a Foreign Corpora-

tion, for 2011. This return reported $2,736,450 of effectively connected income, claimed total deductions of $2,366,629, and reported taxable income of $369,821.

On November 25, 2014, the IRS issued to petitioner a notice of deficiency for the tax years at issue. The notice determined that petitioner for 2009 and 2010 had effectively connected income of $13,595,167 and $19,135,125, respectively, and that petitioner for 2011 had underreported its effectively connected income by $9,897,975. Petitioner timely petitioned for redetermination of the resulting deficiencies and additions to tax.[6]

By amendments to pleadings respondent alleged increased deficiencies for 2010 and 2011. For 2010 respondent urges that petitioner's effectively connected income was $21,380,541; for 2011 he contends that petitioner should be allowed no deductions, increasing its taxable income to $12,634,425. Petitioner amended its pleadings to allege that it erroneously reported $2,736,450 of gross income on its 2011 return and that its effectively connected income for that year was zero.

---

[6]The IRS determined additions to tax under sections 6651(a)(1) and (2) and 6655. We do not address in this Opinion petitioner's liability for additions to tax. On February 15, 2017, petitioner filed with the IRS Service Center in Ogden, Utah, Forms 1120-F for 2009 and 2010. Petitioner filed these returns, which reported no income or tax due, in an effort to "protect its right to receive the benefit of * * * deductions and credits" in the event it was determined to have income effectively connected with the conduct of a trade or business within the United States.

On May 3, 2019, petitioner filed a motion for summary judgment contending that none of the income derived from the charter of the Challenge Vessel was subject to Federal income tax. Respondent concurrently filed a cross-motion for partial summary judgment contending that all of the income from that charter was subject to Federal income tax. Neither motion asks us to address, and we do not address in this Opinion, the extent to which petitioner for any year may be entitled to deductions from gross income or credits against U.S. tax.

## Discussion

The purpose of summary judgment is to expedite litigation and avoid costly, unnecessary, and time-consuming trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). We may grant summary judgment regarding an issue as to which there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); Elec. Arts, Inc. & Subs. v. Commissioner, 118 T.C. 226, 238 (2002). The sole issue presented for decision at this stage of the proceedings is whether petitioner's charter income is subject to Federal income tax. The parties have filed cross-motions for summary judgment on this question, and we find that it may appropriately be adjudicated summarily.

Whether petitioner's charter income is subject to Federal income tax depends first on whether that income was taxable under the Code, i.e., was "effec-

tively connected with the conduct [by petitioner] of a trade or business within the United States." See sec. 882(a)(1). If we answer that question in the affirmative, we must decide the extent (if any) to which petitioner's charter income was exempted from U.S. tax by treaty. See sec. 894(a)(1) ("The provisions of this title shall be applied to any taxpayer with due regard to any treaty obligation of the United States which applies to such taxpayer.").

A.    Taxability Under the Code

Section 882(a)(1) provides: "A foreign corporation engaged in trade or business within the United States during the taxable year shall be taxable * * * on its taxable income which is effectively connected with the conduct of a trade or business within the United States." "[E]ffectively connected" income generally includes "[a]ll income, gain, or loss from sources within the United States." Sec. 864(c)(3). Section 861 sets forth general rules for the sourcing of income. Subject to exceptions not relevant here, U.S.-source income includes "[c]ompensation for labor or personal services performed in the United States" and income from renting or leasing "property located in the United States." Sec. 861(a)(3) and (4).

Under the time charter, petitioner provided property (the Challenge Vessel) and the services of its marine crew in assisting with the decommissioning of oil and gas facilities in the Gulf of Mexico. The questions we must decide are wheth-

er petitioner conducted these activities "within the United States" and whether its income was "effectively connected" with the conduct of that business. See secs. 864(b), 882(a)(1).[7] That will be true if the Challenge Vessel was "located in the United States" or if the services of its marine crew were "performed in the United States." See sec. 861(a)(3) and (4).[8]

1. Analysis

Section 7701(a)(9) generally provides that "[t]he term 'United States' when used in a geographical sense includes only the States and the District of Columbia." However, section 638 expands the definition of the United States for certain purposes. Added to the Code in 1969, section 638 sets forth reciprocal definitions

[7]Petitioner does not dispute that it is taxable as a corporation or that it engaged in a "trade or business" during 2009-2011.

[8]In Tidewater Inc. v. United States, 565 F.3d 299, 308 (5th Cir. 2009), the U.S. Court of Appeals for the Fifth Circuit held that the time charter of a vessel, on the facts presented there, was more properly characterized as a lease than as a contract for services. We need not address that question here, since petitioner's charter income would be sourced the same way under either characterization. Petitioner suggests that its charter income might be characterized as "transportation" income and be sourced accordingly. Adoption of this treatment likewise would not change the analysis. "All transportation income attributable to transportation which begins and ends in the United States shall be treated as derived from sources within the United States." Sec. 863(c)(1). From the commencement of the time charter to August 11, 2011, all of the Challenge Vessel's transportation began and ended within U.S. territorial waters or on the OCS. However petitioner's income is characterized, therefore, the outcome depends on whether the "United States" is defined to include the OCS.

of the terms "United States" and "foreign country" for purposes of tax jurisdiction over continental shelf areas. See Tax Reform Act of 1969, Pub. L. No. 91-172, sec. 505(a), 83 Stat. at 634.

Section 638 is in chapter 1, subchapter I of the Code, titled "Natural Resources." It provides in pertinent part as follows:

> For purposes of applying the provisions of this chapter (including sections 861(a)(3) and 862(a)(3) in the case of the performance of personal services) with respect to mines, oil and gas wells, and other natural deposits--
>
> (1) the term "United States" when used in a geographical sense includes the seabed and subsoil of those submarine areas which are adjacent to the territorial waters of the United States and over which the United States has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources * * * .

Petitioner does not dispute that the United States "has exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources" on the OCS. The United States claims such exclusive rights. See Outer Continental Shelf Lands Act, ch. 345, 67 Stat. 462 (1953) (codified as amended at 43 U.S.C. secs. 1331-1356a (2018)). And that claim "accords with customary international law." FMC Corp. & Subs.v. Commissioner, 100 T.C. 595, 597 (1993).

In the Gulf of Mexico the OCS extends to a distance of up to 200 nautical miles from the U.S. coastline. Ibid.; see 43 U.S.C. sec. 1331(a). The OCS thus comprises a territory that occupies many thousands of square miles. Needless to say, a great variety of maritime activity--commercial and otherwise--occurs within this territory. These activities include fishing, shrimping, pleasure boating and sailing, and commercial transportation of persons and property.

Section 638 expands the term "United States" to include the OCS "[f]or purposes of applying the provisions of this chapter," viz., chapter 1 ("Normal Taxes and Surtaxes"), which includes sections 1 through 1400u-3. But section 638 effects this expansion only for a subset of activities occurring on the OCS, namely, activities "with respect to mines, oil and gas wells, and other natural deposits." The Challenge Vessel conducted all of the activities at issue within U.S. territorial waters or on the OCS. The question, therefore, is whether these activities were conducted "with respect to mines, oil and gas wells, * * * [or] other natural deposits." See sec. 638.

If the statute is construed according its plain terms, the answer to this question would seem to be "yes." During 2009-2011 the Challenge Vessel worked on 11 projects in various "blocks" on the OCS within the Gulf of Mexico. All 11 projects involved decommissioning of oil and gas wells or pipelines connected to

oil and gas rigs. The Challenge Vessel spent most of its time actively engaged in decommissioning activity. It spent the balance of its time in transit between project sites, performing maintenance and repairs in port, or idle at sea awaiting better weather. The latter activities were indispensable components of its central purpose under the charter--to assist in decommissioning oil and gas facilities.

Petitioner urges that the Challenge Vessel was equipped in a way that enabled it to support other types of maritime activity--e.g., laying undersea cables or constructing wind farms--wholly unrelated to oil and gas decommissioning activity. While this was a theoretical possibility, we do not see how it is material to resolution of the question presented. During the tax periods at issue the Challenge Vessel in fact conducted all of its activities, not with respect to fishing, transportation of passengers for hire, laying undersea cables, or other maritime activity, but "with respect to * * * oil and gas wells." See sec. 638. For that reason, the statute by its terms appears to expand "the United States" to include the OCS for purposes of applying the Federal income tax to petitioner.

The parties have directed most of their attention to a regulation issued by the Department of the Treasury (Treasury Department) in 1973. See sec. 1.638-1, Income Tax Regs. The regulation begins by repeating the statutory text, providing that, for purposes of applying Federal tax law "with respect to mines, oil and gas

wells, and other natural deposits," the term "United States" includes the OCS. <u>See</u> <u>id.</u> para. (a)(1). Paragraph (c)(4), captioned "Scope," provides in pertinent part:

> Persons, property, or activities are within the United States * * * or a foreign country, as the case may be, pursuant to this paragraph, only to the extent such persons, property, or activities are engaged in or related to the exploration for, or the exploitation of, mines, oil and gas wells, or other natural deposits.

Respondent does not contend that the Challenge Vessel was used to explore for oil or gas, and all 11 projects on which it worked involved wells that were nonproducing at the time. Respondent nevertheless contends that the vessel's activities were within the scope of section 638 because its activities were "related to the * * * exploitation of * * * oil and gas wells." <u>Id.</u> para. (c). That was so, respondent contends, because decommissioning of oil and gas wells is an inevitable corollary of production activity under Federal offshore leases and Interior Department regulations.

The parties have cited, and we have discovered, no judicial precedent dictating how the regulation should be interpreted as applied to the facts here. However, certain general principles seem fairly well established. One example in the regulation specifically addresses income from the time charter of a vessel. <u>See</u> <u>id.</u> para. (f), <u>Example</u> (<u>5</u>). This example indicates that charter income will be sourced in the United States under section 638 if the vessel's activities are conducted on

the OCS and are related to the exploration for, or the exploitation of, oil and gas wells.[9]

It also seems clear that property or activity may be "related to" exploration or exploitation of natural resources even though that relationship is not direct and immediate. In FMC Corp., 100 T.C. at 605, the taxpayer manufactured industrial cranes that were sold to oil companies "to provide assistance on [OCS] drilling platforms." The question was whether the cranes constituted "export property" for purposes of section 993(c)(1)(B), which required that they be sold for use "outside the United States." The taxpayer argued that "the broader definition of 'United States' under section 638 applies only to determine the Federal income tax consequences of income derived directly from the exploration and exploitation" of mineral resources. FMC Corp., 100 T.C. at 605 (emphasis added). We rejected that argument, holding that section 638 expanded the "United States" to include

_____

[9]In Example 5 an oil and gas company charters a ship from N, a domestic corporation, whose personnel continue to navigate and manage the ship. The ship engages in the exploration for oil and gas on the continental shelf of a foreign country. Sec. 1.638-1(f), Example (5), Income Tax Regs. The example concludes that "the entire income derived * * * [by N] from the charter is income derived from sources within * * * [the] foreign country." Ibid. The reciprocal conclusion necessarily follows in the reciprocal situation (as here) where a foreign corporation derives income from chartering a vessel for use in oil-related activities on the United States OCS. See sec. 638(1) and (2) (providing reciprocal definitions of "United States" and "foreign country" with respect to activities on continental shelf areas).

the OCS even though the affiliate selling the cranes "had no direct involvement in the actual exploration and exploitation of the natural deposits." Id. at 606.

The examples in the regulation likewise give broad scope to the phrase "related to." See sec. 1.638-1(f), Income Tax Regs. Example 3 assumes a medical doctor who travels to OCS drilling platforms to verify the health of rig workers by making "routine physical examinations." The example concludes that the doctor is engaged in activities "related to the exploitation of oil" for purposes of sourcing his income. Example 6 assumes an individual whose sole activity consists of cooking meals for personnel on board a vessel chartered to explore for oil on the OCS. It concludes that the cook's activities are "related to the exploration for oil." Example 2, by contrast, concludes that a lawyer who travels to an OCS drilling platform to interview a client in a domestic relations matter "is not engaged in activities related to the exploration for, or exploitation of, natural deposits."

These examples give wide (but not limitless) scope to the types of activities that are "related to" the exploration for, or exploitation of, natural deposits. Although the fact patterns of these examples involve exploring for or producing oil, respondent urges that the universe of activities "related to the * * * exploitation" of natural resources is broader. Respondent contends that the Challenge Vessel's activities in decommissioning oil and gas wells were "related to the * * * exploi-

tation of * * * oil and gas wells" because these activities were integral to, and an inevitable corollary of, exploiting oil and gas resources on the OCS. We agree.

The Interior Department has promulgated detailed regulations requiring all oil and gas lessees that operate on the OCS to undertake extensive decommissioning activities when wells cease production. Lessees and owners of operating rights are jointly and severally responsible for plugging abandoned or non-producing wells, decommissioning pipelines, removing platforms and related structures, and clearing the sea floor of all obstructions resulting from activities undertaken to exploit oil and gas resources. See 30 C.F.R. secs. 250.1701, 250.1703 (2018). The Federal offshore leases for the areas in which the Challenge Vessel worked explicitly required, as a condition of exploiting oil and gas resources therein, that wells be decommissioned in a responsible manner when production activity ceased.

Petitioner contends that the Challenge Vessel had nothing to do with the "exploitation of * * * oil and gas wells," see sec. 1.638-1(c)(4), Income Tax Regs., because all wells on which it worked either had never produced or had ceased production several years previously. But the exploitation of oil and gas resources on the OCS entails a long process, and many different types of activities are essential to this process. The timeline for "exploitation" includes pre-production activities

(bidding on offshore leases, getting permits, and drilling wells), production activities (staffing platforms, extracting resources, and performing repairs and maintenance), and post-production activities (plugging wells, decommissioning pipelines, and removing debris). All three sets of activities are equally essential. No lease could be secured and no production would ever occur unless the lessee bound itself to carry out the post-production phase of the exploitation cycle. We see no logical reason to exclude post-production activities (any more than pre-production activities) from the universe of activities that are "related to the * * * exploitation of * * * oil and gas wells" on the OCS. Ibid.[10]

Petitioner emphasizes that decommissioning of wells was the legal obligation of the oil and gas lessee (or operator), that EPIC and its divers undertook the undersea decommissioning work, and that petitioner simply provided a ship and crew. But we do not see how this affects the analysis. In deciding whether de-

---

[10]The Challenge Vessel's decommissioning activities were chiefly focused on rigs, platforms, and pipelines damaged by hurricanes. Characterizing hurricanes as "force majeure" events that "disrupted the natural life cycle of the wells," petitioner contends that hurricanes "should be deemed to break any relationship between exploration/exploitation and decommissioning." The Interior Department's decommissioning regulations, however, explicitly required that wells be decommissioned when production activity ceased. Production activity might cease for any number of reasons, including resource depletion, marine accidents, or hurricane damage. The legal obligation to decommission applies regardless of what caused production to cease. See Interior Department Notice, supra note 5.

commissioning is "related to the * * * exploitation of * * * oil and gas wells," it is irrelevant whether the lessee performs that work or contracts it out. And although EPIC's divers actually dismantled the platforms and plugged the wells, the Challenge Vessel and its marine crew performed indispensable supporting services. Indeed, EPIC recognized that it could not have completed its intended scope of work without chartering the Challenge Vessel. If the activities of a medical doctor and cook are "related to" the exploitation of oil and gas resources--as examples in the regulation show--it follows a fortiori that the activities of the Challenge Vessel and its crew were so "related."

Example 5 in the regulation likewise shows the error of petitioner's argument. It posits that company M charters a vessel from company N to explore for oil on a foreign country's OCS. Company M (corresponding to EPIC) supplies personnel to operate specialized equipment, and company N (corresponding to petitioner) supplies personnel to navigate and manage the ship. The example concludes that "the entire income derived * * * by N Corporation from the charter is income derived from sources within [the] foreign country." Sec. 1.638-1(f), Example (5), Income Tax Regs. This example shows that providing a ship and

crew through a time charter may be related to the exploitation of oil and gas wells.[11]

In sum, because the decommissioning activities in which the Challenge Vessel engaged were integral to, and legally required to be undertaken in connection with, the exploitation of oil and gas resources on the OCS, those activities were "related to the * * * exploitation of * * * oil and gas wells" within the meaning of section 1.638-1(c)(4), Income Tax Regs. Section 638(1) accordingly expanded the "United States" to include the OCS. From the commencement of the charter until August 11, 2011, petitioner conducted all of its activities within the "United States" as thus defined. Because petitioner's charter income was derived from the use of property and the performance of services in the United States, its income was sourced in the United States and was "effectively connected" to a trade or business within the United States. See secs. 861(a)(3) and (4), 864(b), 882(a). Petitioner's charter income was thus taxable under the Code.

---

[11]Petitioner contends that EPIC's decommissioning activities cannot be attributed to the Challenge Vessel because it and EPIC were not agents or partners of one another. But we are not employing an attribution rule. Like company N in Example 5, petitioner was responsible for the Challenge Vessel's navigation and management, and those supporting activities were "related to the * * * exploitation of * * * oil and gas wells." See sec. 1.638-1(c)(4), Income Tax Regs.

2.      Petitioner's Arguments

Petitioner urges several arguments in support of a contrary conclusion.  Its

principal position is that section 638 does not apply because the project sites were

not actively producing oil and gas.  But as explained supra pp. 20-21, activities

may be conducted "with respect to * * * oil and gas wells," sec. 638, and be "re-

lated to the * * * exploitation of * * * oil and gas wells," sec. 1.638-1(c)(4), In-

come Tax Regs., even though the wells are not currently producing.  In ascertain-

ing the scope of section 638, we consider the entire cycle of activities necessarily

involved in exploiting oil and gas on the OCS, including pre-production, produc-

tion, and post-production activities.  The Challenge Vessel's decommissioning

activities were inextricably linked to the exploitation of oil and gas resources at

the 11 project sites, regardless of whether the wells were currently producing or

abandoned.  Cf. Shell Oil Co. v. Commissioner, 952 F.2d 885, 890 (5th Cir. 1992)

(holding that costs incurred at abandoned drilling sites were "attributable to min-

ing processes" for purposes of computing windfall profits tax), rev'g 89 T.C. 371

(1987).

Petitioner next contends that, because section 638(1) expands the definition

of the United States to include "the seabed and subsoil" of the OCS, activities con-

ducted on the water's surface are not covered by the statute.  But this country's

exclusive rights on the OCS extend to "installations and other devices permanently or temporarily attached to the seabed." 43 U.S.C. sec. 1333(a)(1). The project sites at which the Challenge Vessel worked had such "installations," and they were the subject of the decommissioning activity. The Challenge Vessel provided essential support for decommissioning these installations by supplying (among other things) a class 2 dynamic positioning system, a nine-man saturation diving system, and a hydraulic deck crane capable of lifting 100 tons. The fact that EPIC's personnel, rather than petitioner's personnel, performed the diving activities is not dispositive in determining the statute's reach.

The regulation confirms this conclusion. It provides: "For purposes of applying this section, persons, property, or activities which are engaged in or related to the exploration for, or the exploitation of * * * oil and gas wells * * * need not be physically upon, connected, or attached to the seabed or subsoil * * * to be deemed to be within the United States." Sec. 1.638-1(c)(1), Income Tax Regs.; see Staff of S. Fin. Comm., 91st Cong., Technical Memorandum of Treasury Position on H.R. 13270, Tax Reform Act of 1969, at 76 (Comm. Print 1969) (recommending that the "United States" be defined to include OCS natural resource activity "whether or not there is a physical connection with the shelf"). It

is immaterial that the Challenge Vessel and its crew performed services on the water's surface only.

The examples to the regulation point to the same conclusion. As noted supra pp. 17-19, they indicate that section 638 expands U.S. tax jurisdiction to reach the activities of a medical doctor, a cook, and a chartered vessel whose personnel "navigate and manage the ship." Sec. 1.638-1(f), Examples (3), (5), (6), Income Tax Regs. All these activities are conducted on or above the water's surface. Yet section 638 applies to such activities because they are "related to" the exploration for, or the exploitation of, oil and gas wells.[12]

---

[12]Petitioner cites Rev. Rul. 81-257, 1981-2 C.B. 214, in support of its contention that U.S. tax jurisdiction over the OCS "is limited to items attached to the seabed." That ruling involved the excise tax on air transportation imposed by section 4261; the ruling concluded that this tax does not apply to helicopter services supplied to semi-submersible drilling rigs while they "are being moved at sea." Rev. Rul. 81-257, 1981-2 C.B. at 215. Section 638 applies "[f]or purposes of applying the provisions of this chapter," viz., chapter 1, which includes sections 1 through 1400u-3. Section 638 does not apply for purposes applying section 4261, which is in chapter 33 of the Code, governing excise taxes on "Facilities and Services." Rev. Rul. 81-257 accordingly does not rely on (or mention) section 638. As explained in the text, the regulation interpreting section 638 clearly shows that U.S. tax jurisdiction over the OCS is not limited to items attached to the seabed. Petitioner's reliance on two other revenue rulings involving excise taxes is similarly misplaced. See Rev. Rul. 77-197, 1977-1 C.B. 344 (addressing sections 4261 and 4371); Rev. Rul. 56-505, 1956-2 C.B. 891 (addressing section 4371).

Petitioner seeks support for its position from a ruling it received from the Department of Homeland Security, U.S. Customs and Border Protection (CBP). Under the Jones Act and related Federal laws, foreign ships like the Challenge Vessel are prohibited from engaging in the transportation of merchandise (including debris) and passengers (other than crew) between "coastwise points" in the United States. See 46 U.S.C. secs. 55101, 55102, 55103, 80104 (2012). "Coastwise points" are ports, islands, and other fixed structures at which passengers or goods may be loaded or unloaded. See Am. Mar. Ass'n v. Blumenthal, 590 F.2d 1156, 1160 (D.C. Cir 1978) ("A coastwise transportation of merchandise takes place * * * when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is unladen at another coastwise point." (quoting 42 Fed. Reg. 46068 (1977))). CBP had previously ruled that drilling platforms and similar structures on the OCS are "coastwise points" but that damaged or destroyed platforms are not considered "coastwise points" if no longer attached to the OCS.

On June 22, 2009, CBP issued a ruling to petitioner reiterating this position, but we do not think it helps petitioner's cause. To begin with, CBP revoked the ruling two months later, stating: "[F]urther information is needed to clarify the status of the wells before a determination may be made regarding whether they constitute coastwise points." More fundamentally, whether damaged platforms

constitute "coastwise points" for purposes of the Jones Act and other maritime laws is not determinative in ascertaining the scope of U.S. tax jurisdiction under section 638 of the Code. The question posed by the regulation is whether the Challenge Vessel's decommissioning activities were "related to the * * * exploitation of * * * oil and gas wells." Sec. 1.638-1(c)(4), Income Tax Regs. This is a different question from that considered by CBP, namely, whether damaged platforms are fixed structures sufficiently similar to ports to be considered "coastwise points."

Finally, petitioner cites Ocean Drilling & Expl. Co. v. United States (ODECO), 988 F.2d 1135 (Fed. Cir. 1993), in support of its assertion that "[r]espondent has gone rogue * * * in its attempt to expand its taxing authority under section 638." The question before the U.S. Court of Appeals for the Federal Circuit in that case was whether income derived by a controlled foreign corporation from insuring offshore drilling platforms on the OCS constituted subpart F income. At the time subpart F income was generally defined to include "income derived from the insurance of United States risks," which in turn was defined to include income from insurance provided "in connection with property in * * * the United States." Id. at 1154 (quoting sections 952(a)(1), 953(a)(1)(A) (1974)).

Thus, the question in ODECO was whether the OCS drilling platforms were "in the United States" for subpart F purposes.

On this point the subpart F regulations appeared to conflict with section 638 and the regulations issued under it. The subpart F regulations, issued in 1964, provided that, "[f]or purposes of section 953(a), the term 'United States' is used in a geographical sense and includes only the States and the District of Columbia." Sec. 1.953-2(a), Income Tax Regs. (flush language); see T.D. 6781, 1965-1 C.B. 320, 324. Section 638, enacted in 1969, expanded the term "United States" to include the OCS for purposes of applying the provisions of chapter 1 (which contained section 953) with respect to oil and gas wells. And Example 8 to the section 638 regulation concluded that income derived from insuring a drilling platform on the OCS was "income derived from the insurance of United States risks, within the meaning of section 953(a)(1)," because the "oil drilling platform is located within the United States under section 638." Sec. 1.638-1(f), Example (8), Income Tax Regs.

The Federal Circuit resolved this conflict in the taxpayer's favor, concluding that "section 638 does not affect section 953." ODECO, 988 F.2d at 1156. The court noted that the legislative history of section 638 repeatedly referred to "mining activities and to personal services performed at mining sites, not to insur-

ance activities." Ibid. It reasoned that "insurance activity is more remote to mining activity than personal service activity conducted at the site of exploration." Ibid. It stated that "[t]he example provided in the regulations to section 638, indicating that section 638 is to apply to insurance activity [viz., Example 8], cannot override the regulations to section 953." Id. at 1157 n.30. And it relied on the principle that "if there is a doubt as to the meaning of the provisions of the Internal Revenue Code, the doubt 'must be resolved in favor of the taxpayer.'" Id. at 1157 (quoting Citizens Nat'l Bank of Waco v. United States, 551 F.2d 832, 843 (Ct. Cl. 1977)).

The Federal Circuit's opinion in ODECO supplies no support for petitioner's position. The court held that income derived from insuring drilling platforms on the OCS was not subpart F income. That holding has no relevance to this case. The court's subsidiary conclusion that OCS drilling platforms are not "within the United States" for purposes of taxing insurance income likewise has no salience here. Insurance aside, petitioner does not dispute that section 638 operates to expand U.S. tax jurisdiction over natural-resource-related activities on the OCS. The thrust of petitioner's position is that nonproducing wells should be distinguished from producing wells for this purpose. The ODECO opinion sheds no light on that point.

The Federal Circuit's discussion of the legislative history of section 638 is not particularly helpful to petitioner. The court cited Congress' intention to extend U.S. tax jurisdiction over "personal services performed at mining sites" and viewed insurance activities as "remote to mining activity." Id. at 1156. The Challenge Vessel's services were "performed at mining sites." And those decommissioning services were not remote from, but rather were integral to, the process of exploiting oil and gas resources on the OCS.

Finally, petitioner errs in implying that the ODECO opinion somehow tarnished section 1.638-1, Income Tax Regs., generally. The Federal Circuit considered only one element of the regulation--Example 8, dealing with insurance risks--and found it to conflict with the Secretary's regulations under subpart F. Since ODECO involved subpart F income, the court concluded that Example 8 "cannot override the regulations to section 953." Id. at 1157 n.30. Example 8 has no relevance to this case, and petitioner has supplied no plausible basis for questioning the regulation as it applies to the issue of statutory construction presented here.[13]

---

[13]Petitioner stated in its motion for summary judgment that, if respondent relied on the section 638 regulations in his simultaneously filed cross-motion, petitioner would "demonstrate that those regulations are invalid in its response." In its response petitioner does not actually challenge the validity of the section 638

(continued...)

B.      Taxability Under the Treaty

Having concluded that petitioner's charter income was taxable under the

Code, we consider next whether a different outcome is required by the bilateral in-

come tax treaty between the United States and the U.K.  This case is governed by

the Treaty that entered into force on March 31, 2003.  See supra note 2.  As a

threshold matter the parties have stipulated that petitioner was a resident of the

U.K. under article 4 of the Treaty (Residence) and met the requirements of article

[13](...continued)
regulations.  Rather it asserts that the "regulations are not entitled to any deference
in the treaty-interpretation context because they flunk the familiar two-step test
required by Chevron."  See Chevron, U.S.A., Inc., v. Nat. Res. Def. Council, Inc.,
467 U.S. 837 (1984).  Petitioner asserts that the regulations contradict the Treaty
and thus are entitled to no deference in interpreting it.

We do not believe that petitioner has raised a cognizable challenge to the
validity of the regulations.  It should have been obvious to petitioner that respond-
ent would rely on his regulations; if petitioner seriously intended to challenge their
validity, it should have done so in its opening brief.  It did not do that, and it did
not mount a proper challenge in its answering brief either, contending only that the
regulations "are not entitled to any deference in the treaty-interpretation context."
The closest petitioner comes to challenging the validity of the regulations is to
assert that "the validity of the[] examples is questionable at best."  That assertion
is accompanied by no analysis, under Chevron or otherwise.  We address infra pp.
44-45 petitioner's assertion that the regulations "contradict * * * the language of
the Treaty."

23 (Limitation on Benefits). The parties also agree that an earlier version of the treaty (1975 Treaty)[14] has some relevance in interpreting the current version.

Article 7(1) of the Treaty provides that "business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein." The parties have stipulated that petitioner does not have a permanent establishment in the United States under the general principles of article 5 (Permanent Establishment). But article 21, titled "Offshore Exploration and Exploitation Activities," creates a special rule for activities carried on in connection with exploitation of natural resources. It provides in pertinent part:

> 1. The provisions of this Article shall apply notwithstanding any other provision of this Convention where activities are carried on offshore in a Contracting State in connection with the exploration (hereinafter called "exploration activities") or exploitation (hereinafter called "exploitation activities") of the sea bed and sub-soil and their natural resources situated in that State.

> 2. An enterprise of a Contracting State which carries on exploration activities or exploitation activities in the other Contracting State shall * * * be deemed to be carrying on business in that other State through a permanent establishment situated therein.

---

[14]Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains, U.K.-U.S., Dec. 31, 1975, 31 U.S.T. 5668 (entered into force Apr. 25, 1980).

The question we must decide is whether the Challenge Vessel's activities, for purposes of the Treaty, were carried on "in connection with the * * * exploitation * * * of the sea bed and sub-soil and their natural resources" in the OCS.

1. Analysis

The Treaty does not define the terms "exploitation" or "in connection with." However, it provides that, absent Treaty context or competent authority agreement dictating otherwise, "any term not defined therein shall * * * have the meaning which it has at that time under the law of that State for the purposes of the taxes to which this Convention applies." Treaty art. 3(2). In particular, "any meaning under the applicable tax laws of that State"--i.e., the country whose tax jurisdiction is being invoked--"prevail[s] over a meaning given to the term under other laws of that State." Ibid.

Neither party contends that the Treaty's context or any competent authority agreement points to a particular definition of the terms "exploitation" and "in connection with" as used in article 21. Accordingly, since we are applying the Treaty to determine whether U.S. tax applies, we must ascertain the meaning that these terms have under U.S. law, particularly under U.S. tax law. See Maximov v. United States, 373 U.S. 49, 53 (1963) (applying the Code in interpreting an undefined treaty term pursuant to a treaty provision deferring to the meaning under the laws

of the State whose tax was sought to be applied); <u>Filler v. Commissioner</u>, 74 T.C. 406, 412-413 (1980) (same).

Section 638 and the regulations promulgated thereunder provide a near-perfect parallel to the Treaty text, and it seems that this parallelism was no accident. Congress enacted section 638 in 1969, when deepwater oil and gas exploration was rapidly expanding in the North Sea, especially off the coasts of the U.K. and Norway. Section 638 expanded the definitions of "United States" and "foreign country," with respect to "mines, oil and gas wells, and other natural deposits," to include each country's continental shelf. It defined the continental shelf as "the seabed and subsoil of those submarine areas which are adjacent to * * * [the respective country's] territorial waters" and over which it had "exclusive rights, in accordance with international law, with respect to the exploration and exploitation of natural resources." Sec. 638.

During the early 1970s the United States entered into a number of bilateral income tax treaties that mirrored the text of section 638. Article 2 of the U.S.-Norway treaty,[15] which entered into force in 1972, provided:

---

[15]Convention the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Property, Nor.-U.S., art. 2(1)(a)(ii), Dec. 3, 1971, 23 U.S.T. 2832, 2836 (entered into force Nov. 29, 1972).

> When used in a geographical sense, the term "United States" * * * includes (A) the territorial sea thereof and (B) the seabed and subsoil of the submarine areas adjacent to the territorial sea, over which the United States exercises sovereign rights, in accordance with international law, for the purpose of exploration and exploitation of the natural resources of such areas, but only to the extent that the person, property, or activity to which this Convention is being applied is connected with such exploration or exploitation.

The final clause--providing that persons and property are within the United States "only to the extent * * * connected with such exploration or exploitation"--added a refinement or clarification that was not explicit in the text of section 638.

The Treasury Department supplied a technical explanation of the U.S.-Norway treaty. See Treasury Department Technical Explanation of the Proposed U.S.-Norway Income Tax Convention, signed at Oslo on Dec. 3, 1971, art. 2, Tax Treaties (CCH) para. 7046, at 147,227. It stated that article 2 was intended to follow section 638, which had been enacted two years previously:

> The addition of a definition of the continental shelf * * * follows section 638 of the Internal Revenue Code and defines the United States continental shelf as the seabed and subsoil of the adjacent submarine areas over which the United States exercises exclusive rights in accordance with international law for the purpose of exploration and exploitation of the natural resources of such area, but only to the extent that the person, property, or activity to which the proposed Convention is to be applied is connected with such exploration or exploitation.

It further explained:

> The defined continental shelf is only part of the United States or Norway, as the case may be, in limited situations. It is included only to the extent that the person, property, or activity to which the Convention is being applied is connected with exploration or exploitation of the continental shelf. The phrase "connected with" does not require physical attachment to the continental shelf to be within the scope of the definition.

The United States executed bilateral income tax treaties with several other countries during 1970-1973--including the Soviet Union, Belgium, and Trinidad and Tobago[16]--that included similar text and were accompanied by similar technical explanations by the Treasury Department.[17]

---

[16]See Convention on Matters of Taxation, U.S.-U.S.S.R., art. II(2)(b), June 20, 1973, 27 U.S.T. 1, 5 (entered into force Jan. 29, 1976); Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion With Respect to Taxes on Income, Belg.-U.S., art. 3(1)(a)(ii), July 9, 1970, 23 U.S.T. 2687, 2691 (entered into force Oct. 13, 1972); Convention for the Avoidance of Double Taxation, the Prevention of Fiscal Evasion With Respect to Taxes on Income, and the Encouragement of International Trade and Investment, Trin. & Tobago-U.S., art. 2(1)(a)(ii), Jan. 9, 1970, 22 U.S.T. 164, 166-167 (entered into force Dec. 30, 1970).

[17]See Treasury Department Technical Explanation of the 1973 U.S.-Soviet Union Income Tax Convention, art. 2, Tax Treaties (CCH) para. 10,630, at 197,215; Treasury Department Technical Explanation of the 1970 U.S.-Belgium Income Tax Convention, art. 3, Tax Treaties (CCH) para. 1359G, at 31,531-31,532; Treasury Department Technical Explanation of the 1970 U.S.-Trinidad and Tobago Income Tax Convention, art. 2, Tax Treaties (CCH) para. 9750, at 189,201-189,202.

The Treasury Department published the section 638 regulations on May 15, 1973, retroactive to December 30, 1969. See T.D. 7277, 1973-1 C.B. 318. Section 1.638-1(c)(4), Income Tax Regs., tracks the refinement that appears in the four treaties discussed above, providing: "Persons, property, or activities are within the United States * * * or a foreign country, as the case may be, * * * only to the extent such persons, property, or activities are engaged in or related to the exploration for, or exploitation of, mines, oil and gas wells, or other natural deposits." And paragraph (c)(1) of the regulation provides, similarly to text in the Treasury Department's technical explanations of those treaties, that "persons, property, or activities which are engaged in or related to the exploration for, or exploitation of, * * * oil and gas wells * * * need not be physically upon, connected, or attached to the seabed or subsoil * * * to be deemed to be within the United States." Sec. 1.638-1(c)(1), Income Tax Regs.

The 1975 Treaty between the United States and the U.K. was signed two years after the Treasury Department issued the section 638 regulations. Article 3(1)(g)(ii)(bb) of the 1975 Treaty defined the "United States" to include

> the seabed and subsoil of the submarine areas adjacent to the coast thereof, but beyond the territorial sea, over which the United States exercises sovereign rights, in accordance with international law, for the purpose of exploration for and exploitation of the natural resources of such areas, but only to the extent that the person, property,

or activity to which the Convention is being applied is connected with such exploration or exploitation * * * .

Article 27A(1) was added to the 1975 Treaty in 1979. See 1975 Treaty, Third Protocol, art. VI (Mar. 15, 1979), RIA Int. Tax Treaty 3578. It provided:

[A] person who is a resident of a Contracting State and carries on activities in the other Contracting State in connection with the exploration or exploitation of the seabed and sub-soil and their natural resources situated in that other Contracting State shall be deemed to be carrying on in respect of those activities a business in that other Contracting State through a permanent establishment * * * situated therein.

The current Treaty was signed on July 24, 2001, and entered into force on March 31, 2003. Article 3(1)(h) defines the "United States" to include "the territorial sea thereof and the sea bed and sub-soil of the submarine areas adjacent to that territorial sea, over which the United States exercises sovereign rights in accordance with international law." And article 21(1) and (2) of the Treaty, like article 27A of the 1975 Treaty, provides that an enterprise is deemed to do business through a "permanent establishment" in a contracting State if its activities are "carried on offshore * * * in connection with the exploration * * * or exploitation * * * of the sea bed and sub-soil and their natural resources situated in that State." Treaty art. 21(1) and (2).

One does not need an advanced degree in linguistics to appreciate the similarities between the text of the statute, the section 638 regulation, and the Treaty. Section 638 extends U.S. tax jurisdiction over the OCS "with respect to mines, oil and gas wells, and other natural deposits." The regulation provides that U.S. tax jurisdiction extends over the OCS "to the extent * * * [that] persons, property, or activities are engaged in or related to the exploration for, or exploitation of, mines, oil and gas wells, or other natural deposits." Sec. 1.638-1(c)(4), Income Tax Regs. And the Treaty provides that an enterprise is deemed to carry on activities through a permanent establishment in the United States, and thus be subject to U.S. tax jurisdiction, where its activities are "carried on offshore * * * in connection with the exploration * * * or exploitation * * * of the sea bed and sub-soil and their natural resources situated in that State." Treaty art. 21(1) and (2).

The historical evolution outlined above shows the symbiotic relationship between section 638, the treaties signed during the next decade, and the regulations. As the Treasury Department explained, the treaties signed during the early 1970s were intended to follow section 638. The regulations promulgated in 1973 picked up the "exploration or exploitation" formula from those treaties. And that "exploration or exploitation" formula was incorporated into the 1975 Treaty and carried to the current U.S.-U.K. Treaty. We accordingly conclude that the term

"exploitation," as used in the Treaty, has the same meaning that it has in section 1.638-1, Income Tax Regs. We thus interpret "exploitation" as used in the Treaty to refer to the entire cycle of activities necessarily involved in exploiting resources on the OCS, including pre-production, production, and post-production activities.[18]

The only distinction between the formulas set forth in the Treaty and the regulation appears in the phrase that precedes "exploration or exploitation." The regulation refers to activities "related to" exploration or exploitation of OCS resources. Sec. 1.638-1(c), Income Tax Regs. The Treaty refers to activities "in connection with" exploration or exploitation of OCS resources. Treaty art. 21(1) and (2). The 1975 Treaty referred to activities "connected with" such exploration or exploitation. 1975 Treaty art. 3(1)(g)(ii)(bb). And article 27A of the 1975 Treaty referred to activities "in connection with" exploration or exploitation.

---

[18]In non-tax contexts the Supreme Court has sought to read statutes in harmony with treaties and rejected constructions of terms that would unnecessarily create conflict between the two. See Menominee Tribe of Indians v. United States, 391 U.S. 404, 412-413 (1968) (declining to interpret a statute to abrogate hunting and fishing rights granted to Native Americans by a treaty); United States v. Payne, 264 U.S. 446, 448 (1924) (stating that a later-enacted statute, while controlling in case of conflict, "should be harmonized with the letter and spirit of the treaty, so far as that reasonably can be done"); Whitney v. Robertson, 124 U.S. 190, 194 (1888) (stating that, where a treaty and legislation relate to the same subject, "the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either").

Applying principles of U.S. tax law, we discern no appreciable difference between the terms "related to," "connected with," and "in connection with." These terms appear throughout the Code and seem to be used interchangeably. Compare sec. 162(e) (denying deduction for expenses incurred "in connection with * * * influencing legislation"), with sec. 162(q) (denying deduction for payment "related to sexual harassment"). Both terms regularly appear close to each other in the same Code provision, with no apparent difference in meaning. Compare sec. 6103(h)(2)(A) (referring to a proceeding "in connection with" determining a taxpayer's liability), with sec. 6103(h)(2)(B) (referring to treatment of an item "related to" resolution of an issue in such proceeding).

Judicial precedents in tax cases likewise show that "in connection with" and "related to" have the same meaning. See Huntsman v. Commissioner, 905 F.2d 1182, 1184 (8th Cir. 1990) (interpreting "in connection with" in section 461(g)(2) as equivalent to having an "association" or "relation"), rev'g 91 T.C. 917 (1988); Fort Howard Corp. & Subs. v. Commissioner, 103 T.C. 345, 352 (1994) ("'In connection with' means associated with, or related."), supplemented by 107 T.C. 187 (1996); Hairston v. Commissioner, T.C. Memo. 2019-104, at *4 (using "related to" and "in connection with" interchangeably); Pope & Talbot, Inc. v. Com-

missioner, T.C. Memo. 1997-399, 74 T.C.M. (CCH) 471, 472 (using "relating to" and "in connection with" interchangeably), supplementing T.C. Memo. 1997-116.

Non-tax judicial precedents point to the same conclusion. In Azima v. RAK Inv. Auth., 926 F.3d 870 (D.C. Cir. 2019), the question was whether a dispute was "in connection with" a contract for purposes of the contract's forum-selection clause. Applying general U.S. contract principles, the U.S. Court of Appeals for the D.C. Circuit stated: "We begin by defining 'in connection with.' This phrase is equivalent to 'in relation to,' which is quite broad." Id. at 877.

In Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123 (2d Cir. 2001), the question was whether a dispute was "related to" a party's insolvency for purposes of the insolvency exclusion in an insurance contract. The U.S. Court of Appeals for the Second Circuit, speaking through Judge (now Justice) Sotomayor, treated the term "relating to" as "equivalent to the phrases 'in connection with' and 'associated with,' * * * and synonymous with the phrase[] 'with respect to.'" Id. at 129 (and cases cited threat); see Huffington v. T.C. Grp., LLC, 637 F.3d 18, 22 & n.2 (1st Cir. 2011) (concluding that "relating to" is synonymous with "in connection with").[19]

---

[19]Petitioner contends that "in connection with" is narrower than "related to," but it cites no U.S. tax authority or case law to support that proposition. Petitioner

(continued...)

As explained supra p. 23, we have concluded that the Challenge Vessel's decommissioning activities were "related to the * * * exploitation of * * * oil and gas wells" for purposes of section 638 because they were integral to, and legally required to be undertaken in connection with, the exploitation of OCS natural resources.  Sec. 1.638-1(c)(4), Income Tax Regs.  For essentially the same reasons, we conclude that the Challenge Vessel's decommissioning activities were carried on "in connection with the * * * exploitation * * * of the sea bed and sub-soil and their natural resources" for purposes of article 21 of the Treaty.  Petitioner thus conducted its U.S. trade or business through a "permanent establishment" in the United States.  Treaty art. 21.

2.    Petitioner's Arguments

Petitioner first contends that the section 638 regulation is "not entitled to any deference in the treaty-interpretation context" because it "contradict[s] * * * the language of the [T]reaty."  But the regulation does not contradict any Treaty language.  Both refer to "exploration or exploitation" of OCS natural resources.  The regulation refers to activities "related to" exploration or exploitation, whereas

---

[19](...continued)
relies exclusively on Black's Law Dictionary, which defined "connection" to mean (among other things) "[t]he state of being connected or joined" and "union by * * * dependence or relation."  See Black's Law Dictionary 274 (5th ed. 1979).  This definition shows that "connection" and "relation" are basically synonymous.

the Treaty refers to activities "in connection with" exploration or exploitation. As explained supra pp. 41-44, these terms are synonymous.

When determining the application of U.S. tax, the Treaty provides that any term not defined therein shall have the meaning it has under U.S. law, particularly under U.S. tax law. Treaty art. 3(2). Generally, regulations have "the force of law." SIH Partners LLLP v. Commissioner, 150 T.C. 28, 41 (2018), aff'd, 923 F.3d 296 (3d. Cir. 2019). Particularly given the symbiotic relationship between the regulations, the 1975 Treaty, and the current Treaty, it is perfectly appropriate to give the term "exploitation," as used in the Treaty, the same meaning that we believe it to have in the regulation promulgated under section 638.

Second, petitioner relies on extra-textual sources to contend that the Treaty covers only "drilling activity" on the OCS. "In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation." Air France v. Saks, 470 U.S. 392, 400 (1985). But the Treasury Department's explanation of the Treaty clearly states that covered OCS activities are not limited to the direct extraction of oil and gas. See Treasury Department Technical Explanation of the U.S.-U.K. Income Tax Convention, art. 21, Tax Treaties (CCH) para. 10,911, at 201,340 (stating that "'exploration activities' and 'exploitation activities' * * *

include, but are not limited to, the exploration for and extraction of oil, minerals, and natural gas." (Emphasis added.)).

Petitioner relies chiefly on the Senate Foreign Relations Committee's report on the Third Protocol to the 1975 Treaty, which added article 27A (the predecessor of Treaty article 21). It stated as follows:

> The proposed protocol adds a new Article 27A to the proposed treaty covering offshore activities. This provision is intended to deal primarily with the activities of certain U.S. independent drilling contractors in the U.K. sector of the North Sea. * * * While the protocol provisions were added primarily to deal with activities of U.S. persons in the North Sea, they also make it clear that British activities in connection with activities on the U.S. continental shelf are subject to U.S. tax. [S. Comm. on Foreign Relations, S. Exec. Rept. No. 96-5, at 12 (1979).]

Similar statements appear in other legislative materials describing article 27A.[20]

---

[20]See Staff of J. Comm. on Taxation, Explanation of Proposed Third Protocol to Proposed Income Tax Treaty Between the United States and the United Kingdom, at 2 (J. Comm. Print 1979) (stating that article 27A "will primarily affect U.S. independent drilling contractors * * * in the U.K. sector of the North Sea and other service companies carrying on ancillary services in connection with drilling"); International Tax Treaties: Hearing on Six International Tax Treaties and Protocols Before the S. Comm. on Foreign Relations, 96th Cong., 1st Sess. 56 (1979) (statement of David H. Brockway, International Tax Counsel, Staff of J. Comm. on Taxation, et al.) (hereinafter Brockway Statement) (stating that article 27A was "intended to deal primarily with the activities of certain U.S. independent drilling contractors and service and supply companies who operate on a temporary basis in the U.K. sector of the North Sea").

These legislative materials will not bear the weight that petitioner seeks to put upon them. As the Joint Committee on Taxation explained, article 27A was added "at the request of the British."[21] It is not surprising that this article was expected to deal "primarily" with North Sea drilling activities, because drilling in the North Sea was expanding rapidly at that time. But article 27A was drafted more broadly, covering all activities "in connection with the exploration or exploitation of the seabed and sub-soil and their natural resources." The Joint Committee on Taxation made clear that article 27A was intended to track section 638 and was reciprocal, so that foreign companies operating on this country's OCS would be taxed on the same basis as U.S. companies operating there.[22] And as explained supra p. 45, the Treasury Department's technical explanation of the current Treaty makes clear that article 21 is not restricted to "drilling activity," stating that "'exploration activities' and 'exploitation activities' * * * include, but are not limited to, the exploration for and extraction of oil, minerals, and natural gas."

---

[21]Brockway Statement, supra note 20, at 57.

[22]See Brockway Statement, supra note 20, at 57 ("The Internal Revenue Code was amended in 1969 so that foreign companies operating on the U.S. continental shelf would be fully subject to U.S. tax on the same basis as U.S. companies operating on the shelf (sec. 638).").

Advancing an alternative argument, petitioner contends that the income it earned from chartering the Challenge Vessel was "shipping income" under article 8(1) of the Treaty. That article provides that "[p]rofits of an enterprise of a Contracting State from the operation of ships or aircraft in international traffic shall be taxable only in that State." Treaty art. 8(1). "[I]nternational traffic" is defined as "any transport by a ship or aircraft, except when the ship or aircraft is operated solely between places in the other Contracting State." Id. art. 3(1)(f).

The Challenge Vessel was not engaged in mere "transport" of passengers or goods. It was chartered as a support vessel with specialized equipment valuable for decommissioning activity, including a class 2 dynamic positioning system, a nine-man saturation diving system, and a hydraulic deck crane capable of lifting 100 tons. In any event the Challenge Vessel was not engaged in "international traffic" because it was operated "solely between places in" the United States as defined in section 638, viz., within U.S. territorial waters, in U.S. ports, or on the OCS.

Finally, petitioner contends that, if it is determined to have had a U.S. "permanent establishment," respondent erred in treating 100% of the charter income as attributable to that permanent establishment. During 2009-2011 the Challenge Vessel spent between 14% and 38% of its time in port (resupplying or maintaining

the vessel), in transit (moving the vessel from port to project sites), or in other nonproductive activity (e.g., idling at sea because of bad weather). See supra p. 9. Petitioner contends that it should be subject to U.S. tax only on the portion of its charter income corresponding to time spent in actual decommissioning activity at the 11 project sites.

We see no merit in this argument. The charter specified a flat daily rate (adjusted from time to time), and petitioner received this payment regardless of whether the Challenge Vessel was engaged in operations, idle at sea, in transit between work sites, or in port between assignments. Time spent resupplying the vessel, performing maintenance, moving between sites, and dealing appropriately with bad weather are inseparable components of a vessel's time charter. All of these activities were essential in carrying out its mission--to support the decommissioning of oil and gas facilities. All of these activities were thus "related to," and were carried out "in connection with," the exploitation of oil and gas wells on the OCS. Petitioner has provided no legal basis for allocating any portion of its charter income to a location other than its U.S. "permanent establishment."

To reflect the foregoing,

<u>An appropriate order will be issued</u> <u>denying petitioner's motion for summary</u> <u>judgment and granting respondent's cross-</u> <u>motion for partial summary judgment</u>.